GIOVANI CARANDOLA, LTD., and
Janel D. Ralph, Plaintiffs,

v.

George BASON, in his official capacity as Chairman of the North Carolina Alcohol Beverage Control Commission; Howard McGlohon and Ricky Wright, in their official capacities as Members of the North Carolina Alcohol Beverage Control Commission; Bryan Beatty, in his official capacity as Secretary of the North Carolina Department of Crime Control and Public Safety; and Greensboro Alcohol Beverage Control Board, a political subdivision of the State of North Carolina; and John Does 1 through 10, Defendants.

No. 1:01CV115.

United States District Court,
M.D. North Carolina.

April 17, 2001.

Thomas F. Loflin, III, Loflin & Loflin, Durham, J. Michael Murray, Steven D.

Shafron, Berkman Gordon Murray & Devan, Cleveland, OH, for Giovani Carandola, LTD, A North Carolina Corporation, plaintiffs.

Isaac T. Avery, III, N.C. Department of Justice, Amy L. Yonowitz, Joyce L. Davis & Associates, John Julian Aldridge, III, N.C. Dept. of Justice, Law Enforcement Liason, Raleigh, Margaret Shea Burnham, Adams Kleemeier Hagan Hannah & Fouts, Greensboro, for George Bason, in his official capacity as Chairman of the North Carolina Alcohol Beverage Control Commission, Howard McGlohon, in his official capacity as Member of the North Carolina Alcohol Beverage Control Commission, Ricky Wright, in his official capacity as Member of the North Carolina Alcohol Beverage Control Commission, Bryan Beatty, in his official capacity as Secretary of the North Carolina Department of Crime Control and Public Safety (Substituted from David E. Kelley 2/20/01), Greensboro Alcohol Beverage Control Board, a political subdivision of the State of North Carolina, John 1–10 Does, defendants.

## MEMORANDUM OPINION

TILLEY, Chief Judge.

This case is now before the Court on Plaintiffs' Motion for a Preliminary Injunction [Doc. # 3], pursuant to Fed.R.Civ.P. 65, restraining Defendants,[1] Defendants'

officers, agents, servants, employees, attorneys, and all persons in active concert or participation with Defendants from enforcing N.C. Gen.Stat. § 18B–1005 (1995) and Alcohol Beverage Control Rule 4 N.C.A.C. 2S.0216 against Plaintiff Giovanni Carandola Ltd., its officers, agents and employees, and against Plaintiff Janel D. Ralph.[2] For the reasons provided below, this motion is GRANTED.

### I.

Plaintiff Giovani Carandola, Ltd., operating as Christie's Cabaret ("Plaintiff Christie's"), is a Greensboro "gentleman's club" licensed by the North Carolina Alcohol Beverage Control Commission ("Commission") to hold Malt Beverage, Fortified Wine, Unfortified Wine and Mixed Beverage Private Club permits. Plaintiff Ralph is employed as a dancer at Christie's. Her dance routines include theme shows, in which Plaintiff Ralph dances two to three songs in costume as an exotic character (i.e. cowgirl, cheerleader, "Baywatch" girl). At least a portion of these performances involve Plaintiff Ralph dancing topless or touching her body.

On November 11, 2000, entertainers[3] at Christie's were allegedly witnessed by Commission officers engaging in acts in violation of N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216. N.C.G.S. § 18B–1005 states, in pertinent part:

---

1. Defendant John Does are "alcohol law enforcement officers employed by and/or agents of the North Carolina ABCC, Department of Crime Control and Public Safety and/or the Greensboro Alcohol Beverage Control Board, whose identities are currently unknown by [P]laintiff." (Comp.¶ 5.)

2. By stipulation, Plaintiff Christie's is willing to forego service of the Complaint upon the Greensboro Alcohol Beverage Control Board, and the Board agrees to be bound by any ruling in this case regarding Plaintiff's chal-

lenge to the constitutionality "of certain portions of Chapter 18 of the North Carolina General Statutes and certain portions of the administrative rules and regulations related thereto[.]" (Stipulation (February 5, 2001).) [Doc. # 15.] Regarding the remaining Defendants, service of process has been accomplished. [Doc. # 17.]

3. Plaintiff Ralph has not been cited as violating N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216.

(A) Certain Conduct.—It shall be unlawful for a permittee or his agent or employee to knowingly allow any of the following kinds of conduct to occur on his licensed premises:

[Section (1)(2)(3) omitted]

(4) Any conduct or entertainment by any person whose private parts are exposed or who is wearing transparent clothing that reveals the private parts;

(5) Any entertainment that includes or simulates sexual intercourse or any other sexual act; or

(6) Any other lewd or obscene entertainment or conduct, as defined by the Rules of the Commission.

Rule 4 NCAC 2S.0216 states:

(A) No permittee or his employee shall allow any person to perform acts of or acts that simulate:

(1) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, or any sexual acts that are prohibited by law;

(2) the touching, caressing or fondling of the breasts, buttocks, anus, vulva or genitals;

(3) the display of the pubic hair, anus, vulva or genitals.

(B) No permittee or his employee shall allow any person to use artificial devices or inanimate objects to depict any of the prohibited activities described in Paragraph (A) of this Rule.

(C) No permittee or his employee shall allow any person who exposes to public view any portion of his pubic hair, vulva, genitals or anus to remain in or upon the licensed premises.

In December, 2000, Plaintiff Christie's received a Notice of Alleged Violation (Ex. 3, Am.Comp), citing that Christie's had violated the aforementioned statute and regulation, when, on the licensed premises: an employee simulated sexual intercourse, on two occasions an employee engaged in acts of touching, caressing or fondling of the breasts, and an employee simulated masturbation.[4] With the Notice of Alleged Violation, the Commission included a Proposed Stipulation and Offer in Compromise (*Id.*), in which Plaintiff could stipulate to the violations and have its permits suspended for 30 days, beginning February 9, 2001, subject to the last 15 days being avoided upon payment of a $3000 penalty by February 2, 2001. Plaintiff Christie's has not agreed to the Stipulation or Offer in Compromise. Further, Plaintiff alleges that the Commission informally advised Plaintiff that if no resolution were reached by the end of January, formal charges would be initiated.

While no formal charges are pending against Plaintiffs, Plaintiff Christie's alleges that it faces an imminent threat of prosecution. Further, Plaintiff Ralph alleges that this threat, along with the existence of N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216, act to chill her "right to express certain messages during the course of her dance performances." (Am. Comp.¶17.) Plaintiffs seek relief from this Court, in part, by requesting that the Court declare both restrictions unconstitutional on their faces and as applied, and issue a preliminary injunction,[5] forbidding enforcement of both N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216 against Plaintiffs.

---

4. Employees are also cited in alleged violation of Rule 4 NCAC 2S.0212(a) for performing services after consuming alcoholic beverages.

5. The parties agreed to forgo Court decision on the Motion for a Temporary Restraining Order and have the issue decided by Court consideration of this Preliminary Injunction Motion.

## II.

### A.

When determining whether to issue a preliminary injunction, a court must consider four factors: "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir.1991); *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.1997). Plaintiff bears the burden of establishing each of the four factors to support granting the injunction. *Direx*, 952 F.2d at 812.

For purposes of this injunction, the Court adopts the approach of the Fourth Circuit in the unpublished opinion, *Mom N Pops, Inc. v. City of Charlotte*, 162 F.3d 1155, No. 97–2359, 1998 WL 537928 (4th Cir. Aug.19, 1998). There the Fourth Circuit concluded:

> [o]rdinarily, the court should first address the balance of harms by determining whether the plaintiff is likely to suffer some irreparable harm absent an injunction, and if so, whether the harm to the plaintiff outweighs the potential harm of an injunction to the defendant. [citation omitted] However, in this case the irreparable harm [Plaintiff] alleges is inseparably linked to its claim of a violation to its First Amendment freedom of speech. [citation omitted] Therefore, to properly address [Plaintiff's] claim of irreparable injury, we must first determine [Plaintiff's] likelihood of succeeding on the merits of its claim.

*Id.* at *1. In this case, the irreparable harm Plaintiffs allege is also inseparably linked to their claim of violation of First Amendment rights so the first consideration should be Plaintiffs' likelihood of success on the merits.

### B.

#### i.

 When considering Plaintiffs' likelihood of success on the merits, the Supreme Court decision in *City of Erie v. Pap's A.M.* is instructive. 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). In *Pap's* the Supreme Court considered whether a city's public indecency ordinance, proscribing nudity in public places, was constitutional when the ordinance was challenged by a nude, exotic dance establishment. *Id.* The Supreme Court concluded that "nude dancing of the type at issue here is expressive conduct, although we think that it falls only within the outer ambit of the First Amendment's protection." *Id.* at 289, 120 S.Ct. at 1391 (citing *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991)).

When determining which level of scrutiny to apply to the city ordinance, the Supreme Court noted

> ... we must decide "whether the State's regulation is related to the suppression of expression." [Citation omitted.] If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the "less stringent" standard from O'Brien for evaluating restrictions on symbolic speech. [citation omitted.] If the government interest is related to the content of the expression, however, then the regulation falls outside the scope of the O'Brien test and must be justified under a more demanding standard.

*Pap's* at 289, 120 S.Ct. at 1391 (referring to *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968));

*Ranch House, Inc. v. Amerson,* 238 F.3d 1273, 1278 (11th Cir.2001).

The 11th Circuit recently applied the reasoning in *Pap's* to determine the appropriate scrutiny for analyzing two Alabama statutes prohibiting nudity for "entertainment purposes" and prohibiting operation of adult oriented businesses within 1,000 feet of various buildings such as schools or churches. *Ranch House,* 238 F.3d at 1275. Plaintiff in the case, a corporation of clubs offering nude female dancing, challenged the statutes as unconstitutional under the First Amendment because they allegedly restrained plaintiff's right to free expression. *Id.* at 1275–76.

The 11th Circuit noted that the statute prohibiting nudity only for "entertainment purposes" is not neutral as to content, as it distinguishes between certain types of nude expression in its prohibitions. *Id.* at 1278–79. Nonetheless, the fact that a statute, on its face, distinguishes between content, does not necessarily make the statute content-based for purposes of First Amendment analysis and thus subject to strict scrutiny. *Id.* Applying the secondary effects doctrine, the 11th Circuit noted that the "ultimate question is whether the legislature's purpose is to suppress the content of the proscribed message because of a disagreement with that message or concern over the direct effect of that message on its observers," instead of concern for the secondary effects of such message on the community. *Id.* at 1279–80 (citing *City of Renton v. Playtime Theatres,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) in which the Supreme Court considered evidence of the secondary effects of adult movie theaters in Seattle residential

areas, including adverse effects on neighborhood children, community improvement efforts, and general neighborhood blight).[6] In summary, if the legislature's purpose is to suppress the content of expression, strict scrutiny applies. *Id.* at 1282. If the legislature's purpose is to address secondary effects, intermediate scrutiny applies as framed in *O'Brien.* *Id.* at 1282, 1284–85.

As the Supreme Court noted in *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 1888, 146 L.Ed.2d 865 (2000), "[w]hen the government restricts speech the Government bears the burden of proving the constitutionality of its action." Similarly, to be entitled to intermediate scrutiny in this preliminary injunction motion, the government must present sufficient evidence to suggest that the legislature's purpose, when enacting the challenged statute, was to combat the secondary effects of the proscribed expression, rather than merely oppose the content of such expression. *See Ranch House,* 238 F.3d at 1283 (discussing government's burden in light of the secondary effects doctrine).

ii.

■ Turning to the case at hand, both N.C.G.S. § 18B –1005 and Rule 4 NCAC 2S.0216 make distinctions on their face regarding content. For example, N.C.G.S. § 18B –1005 selectively proscribes "entertainment that includes or simulates sexual intercourse or any other sexual act," as opposed to other forms of entertainment. Furthermore, Rule 4 NCAC 2S.0216 prohibits entertainers from "touching of the breasts," as opposed to touching other body parts. As presented, the fact that

---

6. The often cited secondary effect is crime. *California v. LaRue,* 409 U.S. 109, 111, 93 S.Ct. 390, 393, 34 L.Ed.2d 342 (1972); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, n. 34, 96 S.Ct. 2440, 2453, n. 34, 49 L.Ed.2d 310 (1976) (presenting legislative finding that "a concentration of 'adult' movie theaters causes the area to deteriorate and become a focus of crime").

the statute and regulation distinguish between content, does not necessarily make them content-based for purposes of First Amendment analysis, if both were designed to combat secondary effects of the proscribed expression on the community.

A substantive question is whether Defendants have provided sufficient evidence that N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216 are designed to address the secondary effects of the proscribed expression. The Defendants, in spite of an exhaustive search, have failed to present any evidence from records of legislative proceedings to suggest that the restrictions in question were enacted to address secondary effects. Furthermore, the Defendants have pointed to no language in the statute or regulation to suggest this intent.

N.C. Gen. Stat § 18B–100 (1995), entitled "Purpose of Chapter," provides that Chapter 18 is "intended to establish a uniform system of control over the sale, purchase, transportation, manufacture, consumption, and possession of alcoholic beverages in North Carolina, and to provide procedures to insure the proper administration of the ABC laws under a uniform system throughout the State." N.C.G.S. § 18B–100 does not provide evidence of concern for secondary effects because the stated need to "establish a uniform system" fails to provide any reason as to why the legislature decided to uniformly prohibit conduct, proscribed by N.C.G.S. § 18B–1005, as opposed to other conduct on licensed premises.

The Defendants note that the language of Rule 4 NCAC 2S.0216 appears to be modeled after the language of a regulation the Supreme Court upheld in *California v. LaRue*, 409 U.S. 109, 111–12, 93 S.Ct. 390, 393–94, 34 L.Ed.2d 342 (1972).[7] To reach intermediate scrutiny, it is permissible for a legislature to have relied upon evidentiary foundations presented in court opinions which present the secondary effects caused by the presence of adult entertainment establishments. *See Pap's*, 529 U.S. at 297, 120 S.Ct. at 1395 (noting that the city of Erie "expressly" relied upon *Barnes* and its discussion of secondary effects). In *LaRue*, the Supreme Court referred to evidence of "Bacchanalian revelries"[8] associated with adult entertainment establishments which included secondary effects: "Prostitution occurred in and around such licensed premises, and involved some of the female dancers. Indecent exposure to young girls, attempted rape, rape itself, and assaults on police officers took place on or immediately adjacent to such premises." 409 U.S. at 111, 93 S.Ct. at 393.

The Defendants argue that because the language of Rule 4 NCAC 2S.0216 appears modeled after the *LaRue* regulations, it must be inferred that the Commission enacted Rule 4 NCAC 2S.0216 out of similar concern for secondary effects. Nonetheless, the inference fails as the legislature may have adopted the *LaRue* language out of a desire to use language that would meet constitutional muster, regardless of the underlying purpose of the statute. Such language could similarly have been chosen if the Commission was simply hostile to the message exotic dancing communicates. Use of the same language, alone, is not sufficient to show the legislature was concerned about secondary effects. Un-

**7.** In 1996, *LaRue* was disavowed by *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516, 116 S.Ct. 1495, 1514, 134 L.Ed.2d 711 (1996) insofar as its reasoning relied upon the Twenty-first Amendment, but the Supreme Court did not question the *LaRue* holding.

**8.** *44 Liquormart, Inc.*, 517 U.S. at 515, 116 S.Ct. at 1514 (describing the activities presented in *LaRue* ).

like in *Erie*, there is no "express" reliance by either the Commission or the N.C. legislature upon any evidence of such effects.

At hearing, Defendants presented the testimony of a former member of the 1980 North Carolina General Assembly, who served as chairman of the Alcohol Beverage Control Committee in the House. The former N .C. legislator testified that during his service, the Committee passed a resolution to form a study commission to rewrite the ABC laws. These rewritten laws included N.C.G.S. § 18B–1005 in 1982. Testimony was presented that

> the staff brought us some studies, nationwide studies which indicated that there were some problems with nude dancing and serving of alcohol, and there was— as I recall, we also had some testimony from law enforcement indicating that they needed some authority in certain types of clubs where nude dancing [sic], and as a result of that, even though we rewrote part of the previous chapter and tried to conform, as I recall, to some federal cases that had come down ... (R. at 41–42).

[* * *]

Q: ... did you vote to approve this language because you personally disagreed with the conduct itself or did you vote to combat the secondary harmful effects that this may have on a licensed premises?

A: I do not believe that I would have recommended ... that we leave this language or similar language in the statute if we had not had some evidence and some discussion about some effects that would have made us do it, some detrimental effects. (R. at 44–45.)

The former legislator's testimony suggests that at least some N.C. legislature members considered evidentiary studies before approving N.C.G.S. § 18B–1005. Nonetheless, the type of studies are unknown. Testimony does not reveal that studies focused on secondary effects, instead of focusing on the direct effect of a believed "immoral" message on its observers.[9] In fact, the reference that law enforcement "needed some authority in certain types of clubs" suggests perhaps that concern was the emotive impact of that message on club patrons. While, the former legislator opined, although not remembering per se, that he would not have supported the statutory language without evidence of "detrimental effects," there is no description of any such effects before this Court.

Overall, N.C.G.S. § 18B–1005, Rule 4 NCAC 2S.0216, and legislative and administrative records are all devoid of any reference to concern for secondary effects. The fact that regulation language mirrors that in *LaRue* is not conclusive that such evidence was considered. Similarly, even if the testimony of a former legislator suggests that he, personally, considered certain secondary effects, the opinion of a single legislature member cannot be projected as the intention of the body. Evidence in the language of the statute, regulation, administrative or legislative record would better reflect the common legislative purpose behind the restrictions. The only statutory evidence of legislative purpose, N.C.G.S. § 18B–100, does not suggest that concern for secondary effects directed the specific prohibitions of N.C.G.S. § 18B–1005. The state has failed to provide sufficient evidence that the challenged statute and regulation were not purposed upon

---

9. The emotive impact of speech on its audience is related to the content of expression itself and is not a secondary effect. *Texas v.* *Johnson,* 491 U.S. 397, 412, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1989).

hostility towards the content of expression. Thus, both should receive strict scrutiny.

### iii.

The Supreme Court notes that "if a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. [citation omitted] If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy,* 529 U.S. at 813, 120 S.Ct. at 1886, *Reno v. American Civil Liberties Union,* 521 U.S. 844, 874, 117 S.Ct. 2329, 2346, 138 L.Ed.2d 874 (1997) (finding the burden on speech "unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve"). Further, the government bears the burden of identifying the compelling interest and explaining why a less restrictive alternative would be ineffective. *See Playboy,* 529 U.S. at 816–27, 120 S.Ct. at 1888–93.

■ A substantive question exists whether the state has identified a compelling interest, or any justification, for originally enacting N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216. As discussed, the state provided the testimony of a former legislator, who expressed a concern for the "detrimental effects" of combining nude dancing with alcohol and noted that police officers needed some "authority in certain types of clubs where nude dancing" occurred. The specifics of these "effects" or why "authority" was needed are simply lacking. Perhaps, the statutory "purpose" of chapter 18, the need to "establish a uniform system" and "proper administration" of ABC laws provides a legitimate reason on which the state can rely. N.C.G.S. § 18B–1005. Nonetheless, even if that is the case, N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216 do not appear sufficiently narrowly tailored to achieve this goal or even advance this goal.

In *Reno,* the Supreme Court considered the constitutionality of provisions of the Communications Decency Act ("CDA"), 47 U.S.C. § 223(a), (d) (1994 ed., Supp II). 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874. The CDA prohibited transmission of any "obscene or indecent" message by telecommunications devices to persons under the age of 18 (§ 223(a)), and the sending or displaying of any message, in a manner that is available to a person under 18, that "in context, depicts or describes, in terms patently offensive as measured by community standards, sexual or excretory activities or organs" (§ 223(d)). The Supreme Court subjected the CDA to strict scrutiny as a content-based restriction, noting that the purpose of the CDA was not to address the secondary effects of indecent speech, but to protect children from the primary effects of such speech. *Reno,* 521 U.S. at 867–68, 117 S.Ct. at 2342–43.

The Supreme Court concluded that in light of the "breadth" of content that the CDA restricted, the government failed to meet its "heavy burden" of explaining why a less restrictive provision would not be as effective. *Id.* at 879, 117 S.Ct. at 2348. The CDA suffered from over-breadth problems due to undefined terms such as "indecent" and "patently offensive." *Id.* at 871–78, 117 S.Ct. at 2344–48. The Supreme Court questioned,

> Could a speaker confidently assume that a serious discussion about birth control practices, homosexuality, . . . or the consequences of prison rape would not violate the CDA? This uncertainty undermines the likelihood that the CDA has been carefully tailored to congressional goals of protecting minors from potential harmful materials.

*Id.* at 871, 117 S.Ct. at 2344. Overall, "given the vague contours of the coverage of the statute, it unquestionably silences some speakers whose messages would be entitled to constitutional protection." *Id.* at 874, 117 S.Ct. at 2346.

Like the CDA in *Reno,* N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S .0216 suffer from undefined, vague restrictions which act to extend the contours of prohibition into the realm of constitutionally protected expression. For example, considering N.C.G.S. § 18B–1005, how is an entertainer to know what is a "sexual act," and what amounts to "simulation" of such an act? More specifically, what constitutes "simulating" the "touching" of the "breasts" or "buttocks" in violation of Rule 4 NCAC 2S.0216? These definitions matter, as a loose construction of terms creates overbreadth problems.

At hearing, the ABC officer, who issued three citations to Christie's dancers, testified as to the types of conduct the statute and regulation prohibit on permit premises:

Q. So, it is your job [as ABC officer] if you see a permit establishment putting on an entertainment show, you understand that statute to prohibit that show from including any simulation of sexual intercourse during the course of that entertainment show, correct?

A. Yes.

Q. And that's true even if the simulation of the sexual act is important to the plot of the show, for example, correct?

A. According to the law, yes.

Q. . . . even if it is an award winning play . . . ?

A. If it's on a permit premises.

Q. . . . even though they are fully clothed, that would be a violation or a potential violation?

A. Yes.

Q. If in the course of a play a fully clothed actress touched or fondled her breast for a fleeting moment . . . that would constitute a violation . . . ?

A. Yes.

Q. Now, if a rock star . . . during the course of the performance grabs his fully clothed genitals, that would be a violation of the prohibition . . . ?

A. Yes.

 [* * *]

Q. If a ballet were performed at a convention center . . . that had a permit, and the dancers during the course of the ballet, one dancer fondled or touched the buttock of the woman during the course of lifting her up in the air, that could be a violation of the prohibition . . . ?

A. It could be.

Q. And that would be true, no matter how high the quality, otherwise would be of that ballet taken as a whole of that entire ballet, correct?

A. Yes.

(R. at 86–88.) This testimony reveals how far literal enforcement and interpretation of N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216 may extend, touching upon serious works of art.

Plaintiffs provided the testimony of Dr. Judith Hanna, an anthropologist, who specializes in the nonverbal communication of dance.[10] Dr. Hanna presented specific ex-

---

10. Dr. Hanna holds a Ph. D. in anthropology from Columbia University and has published various books including, *To Dance is Human, A Theory of Nonverbal Communication, The Performer Audience Connection, Dance,* *Sex, and Gender, Dance and Stress,* and *Partnering Dance and Education, Intelligent Moves for Changing Times.* Furthermore, she has published approximately 100 articles in peer review journals, and has conducted

amples of how serious works of art contain "simulation" of sexual activities. (R. at 20–23.) For instance, the New York City Ballet has performed "Bukago," a ballet depicting a Japanese wedding ritual and consummation of a wedding night. Dr. Hanna presented a picture of the consummation moment in "Bukago" (Pls.' Ex. 1), when a male dancer clutches a female dancer to his midsection, while she lies, draped in a horizontal position with her leg over his shoulder. According to Dr. Hanna, the performance builds to this moment, the "whole focus" of the ballet. (R. at 21.) Similarly, Dr. Hanna noted the ballet, "Mutations," a nude ballet with award winning choreography depicting, in part, sexual activities. Dr. Hanna presented a picture from "Mutations" (Pls.' Ex. 2), where a female dancer arches her back off the floor, and a male dancer lies upon her with his head resting between her legs. Both ballets, according to Dr. Hanna, are recognized as having serious artistic value. (R. at 21–22.)

In light of testimony from Dr. Hanna, the ABC officer, and the plain wording of the statute, the dance described in "Bukago" and "Mutations," no matter how artfully choreographed, appears to violate N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216 if performed on permit premises. Neither restriction is sufficiently narrowly tailored to avoid treading upon such constitutionally protected speech, speech that exists even in the heartland of protection instead of its fringes. Less restrictive alternatives clearly exist.[11]

Overall, the Defendants have failed to specify a legitimate justification as to why any type of exotic dancing should be circumscribed, let alone, the simulation of sex in an award winning play or ballet. *See Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989) ("'[s]exual expression which is indecent but not obscene is protected by the First Amendment"); *Reno,* 521 U.S. at 874, 117 S.Ct. at 2346. The stated need to "establish a uniform system" and achieve "proper administration" of ABC laws, even if a compelling interest, is not promoted by specifically prohibiting certain expressive conduct through N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216. The lack of causal connections between these restrictions and achieving those statutory "purposes," suggests that the restrictions were not ultimately created for this reason.

N.C.G.S. § 18B –1005 and Rule 4 NCAC 2S.0216 place too broad a prohibition on protected speech and do not serve any compelling interest. Plaintiff's likelihood of success on the merits appears great as

original research on the topic of dance in Africa, American schools and theaters, and 86 exotic dance clubs within the United States.

11. Even if the Court were convinced that N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216 were designed to combat secondary effects, it is unlikely that these restrictions satisfy the fourth prong of *O'Brien* intermediate scrutiny, in which the incidental restriction on alleged First Amendment freedoms must be no greater than essential to further the asserted interest. *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679; *Ranch House,* 238 F.3d at 1285 (expressing concern for whether a statute, prohibiting nude entertainment, extends further than essential in that it prohibits nudity in plays where the naked body serves a "prominent and stylistically meaningful role"). In *Barnes,* the Supreme Court found that a statute requiring exotic dancers to wear pasties and G-strings satisfied the fourth prong of *O'Brien,* but noted that with the statute, the dancer and her employer were not "limited by anything short of obscenity laws from expressing an erotic message by articulate speech or representational means." 501 U.S. 560, 587, 111 S.Ct. 2456, 2471, 115 L.Ed.2d 504 (1991). Here, such additional limitations exist.

both restrictions fail to satisfy strict scrutiny.

### C.

■ Where there is a strong likelihood of success on the merits, the balance of irreparable harms need not tip decidedly in favor of Plaintiffs. *See Direx*, 952 F.2d at 813 (considering the balance of harms before the likelihood of success). When considering harm to Plaintiffs, the "loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216 effectively chill Plaintiff Christie's ability to provide adult entertainment to patrons which, at least in part, includes expression within the outer ambit of the First Amendment's protection.[12] Similarly, Plaintiff Ralph's ability to perform such exotic dance is curtailed:

> I have gone from working five to six days a week from [sic.] three to four because I've been really concerned about my dancing and what I'm doing wrong ... I went from being able to express myself while I'm doing a dance to worrying about everything I'm doing while I'm dancing, wondering if I'm doing something wrong, if I am going to get in trouble for it ... (R. at 62–63).

■ The Defendants argue that Plaintiff Christie's is not prevented from engaging in any expressive conduct; the Defendants "only regulate the sale of alcohol." (Defs.' Resp. T.R.O. Mot. Supp. Mem. at 5.) If Christie's did not sell alcohol, Defendants note, N.C.G.S. § 18B –1005 and Rule 4 NCAC 2S.0216 would not apply. This argument fails because, while the Twenty First Amendment to the Constitution grants North Carolina the power to prohibit commerce in alcoholic beverages, the Amendment does not license the state to ignore its obligations under the First Amendment. *See 44 Liquormart*, 517 U.S. 484, 516, 116 S.Ct. 1495, 1514-15, 134 L.Ed.2d 711 (1996) (considering Rhode Island's ban on liquor price advertising). North Carolina cannot regulate the sale of alcohol to unconstitutionally restrict free speech. Potential constitutional harm to Plaintiffs is inescapable if the motion for preliminary injunction is denied.

12. Plaintiffs' expert, Dr. Hanna, testified as to the types of dance expression she observed at Christie's (R. at 17–18):

Q. Did each of the performances that you saw, taken as a whole, have serious artistic value?
A. Yes.
Q. In what way?
A. In terms of what art is, art is a learned skill, it is creative imagination, and it is communication, and the dancers all had to have some learned skill. I mean, you can't even walk in 5–inch heels without some practice, without some practicing and look good and look graceful and even to just go from the floor to standing up tall or to—I forgot to mention that they have poles, so a lot of women do gymnastics and just even to be able to land on those 5–inch heels, you know, takes a learned skill and then some of them, of course, have a lot and again, it ranges. In terms of creative imagination, each dancer draws upon her own talents and skills to create a choreography. I mean, there is a lot of improvisation, but they work out certain kinds of moves and the dancers are very creative in terms of kind of costume that they come out in. One dancer I saw two times, I mean, first time she came out with—I don't know what you call, like strings with colors and twirling them and another time she came out in a very different kind of costume and did a faster routine, so a lot of creative imagination is involved in those routines.
Q. And was the music an important factor in the artistry?
A. Yes, it was.
Q. What role did that play?
A. Well, a lot of dancers asked the DJ to play specific songs, because they can get into it better and they feel more comfortable with it. It compliments their kind of dancing that they excel at.

## D.

 This potential harm to Plaintiffs shall be balanced against the potential harm to Defendants if the preliminary injunction is granted. *Steakhouse, Inc. v. City of Raleigh,* 166 F.3d 634, 637 (4th Cir.1999). Defendants argue that such injunction "directly implicates the ability of the State of North Carolina to effectively regulate the sale of alcohol and protect the welfare of the people of North Carolina." (Defs.' Resp. T.R.O. Mot. Supp. Mem. at 7.) While the State holds a legitimate interest in establishing a uniform system of control and administration over the sale of alcohol, that system is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction. Defendants have failed to substantiate any harm. When compared with the potential harm to Plaintiffs, the balance of harms tends towards issuance of the preliminary injunction.

## E.

 As a final prerequisite for preliminary injunction, Plaintiffs must show that preliminary injunction serves the public interest. *Direx,* 952 F.2d at 814. It is in the public interest to prevent application of a statute and regulation, likely to be found unconstitutional. While it is important for the state to control the sale of alcoholic beverages, the means for doing so cannot be carried out with unconstitutional restrictions on free speech. *See Playboy Enter., Inc. v. Meese,* 639 F.Supp. 581, 587 (D.D.C.1986) (noting that "it is in the public interest to uphold a constitutionally guaranteed right"). The public interest is greater served by issuing the requested preliminary injunction.

## III.

Overall, Plaintiffs have shown that the balance of irreparable harms tips in Plaintiffs' favor. Further, there is sufficient likelihood of success on the merits of the underlying dispute. Lastly, preliminary injunction serves the public interest. Plaintiffs' Motion for Preliminary Injunction is GRANTED, and enforcement of N.C.G.S. § 18B–1005 and Rule 4 NCAC 2S.0216 against Plaintiffs is presently forbidden.