Filed:  October 17, 2002

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 01-1726
(CA-01-115)

———————————

Giovani Carandola, Limited, etc., et al.,

Plaintiffs - Appellees,

versus

George Bason, etc., et al.,

Defendants - Appellants.

———————————

O R D E R

———————————

The court amends its opinion filed August 30, 2002, as follows:

On page 8, footnote 1 -- the second sentence of the footnote is amended to read:  "On appeal, Carandola does not argue that N.C. Gen. Stat. § 18B-1005(a)(1), (2), (3), or (6) (prohibiting fighting, disorderly conduct, gambling, and the like, and authorizing the Commission to write certain rules) violate the Constitution, and we see no reason to hold that they do."

For the Court - By Direction

/s/ Patricia S. Connor

_____
                Clerk

Order granting limited rehearing
(for purpose of revising opinion)
filed 10/17/02

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

| | |
|---|---|
| GIOVANI CARANDOLA, LIMITED, a North Carolina Corporation; JANEL D. RALPH, *Plaintiffs-Appellees,* | |
| v. | |
| GEORGE BASON, in his official capacity as Chairman of the North Carolina Alcohol Beverage Control Commission; HOWARD MCGLOHON, in his official capacity as Member of the North Carolina Alcohol Beverage Control Commission; RICKY WRIGHT, in his official capacity as Member of the North Carolina Alcohol Beverage Control Commission; BRYAN BEATTY, in his official capacity as Secretary of the North Carolina Department of Crime Control and Public Safety, *Defendants-Appellants,* | No. 01-1726 |
| and | |
| GREENSBORO ALCOHOL BEVERAGE CONTROL BOARD, a political subdivision of the State of North Carolina, *Defendant.* | |

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., Chief District Judge.
(CA-01-115)

Argued: December 4, 2001

Decided: August 30, 2002

Before NIEMEYER, MOTZ, and TRAXLER, Circuit Judges.

---

Affirmed in part and vacated in part by published opinion. Judge Motz wrote the majority opinion, in which Judge Traxler joined. Judge Niemeyer wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** David Roy Blackwell, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants. J. Michael Murray, BERKMAN, GORDON, MURRAY & DEVAN, Cleveland, Ohio, for Appellees. **ON BRIEF:** Roy Cooper, North Carolina Attorney General, Amy L. Yonowitz, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants. Steven D. Shafron, BERKMAN, GORDON, MURRAY & DEVAN, Cleveland, Ohio, for Appellees.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

In this case, the North Carolina Alcoholic Beverage Control Commission (the Commission) appeals from the district court's order preliminarily enjoining it from enforcing certain state restrictions on nudity and other conduct, pending the outcome of a trial. For the reasons stated herein, we affirm in part and vacate in part.

I.

Giovani Carandola, Ltd. operates Christie's Cabaret, a nude dancing establishment in Greensboro, North Carolina, which holds permits

2

issued by the Commission to sell malt beverages, fortified wines, unfortified wine, and mixed beverages. In November 2000, an agent of the Commission visited Christie's and observed three Carandola employees engaging in various kinds of exotic dancing. The agent concluded that the dancers' conduct violated N.C. Gen. Stat. § 18B-1005(a) (1995) and an administrative rule promulgated pursuant to that statute.

In pertinent part, § 18B-1005 provides:

> (a) Certain Conduct. — It shall be unlawful for a permittee or his agent or employee to knowingly allow any of the following kinds of conduct to occur on his licensed premises:

> (1) Any violation of this Chapter;

> (2) Any fighting or other disorderly conduct that can be prevented without undue danger to the permittee, his employees or patrons;

> (3) Any violation of the controlled substances, gambling, or prostitution statutes, or any other unlawful acts;

> (4) Any conduct or entertainment by any person whose private parts are exposed or who is wearing transparent clothing that reveals the private parts;

> (5) Any entertainment that includes or simulates sexual intercourse or any other sexual act; or

> (6) Any other lewd or obscene entertainment or conduct, as defined by the rules of the Commission.

Pursuant to subsection (a)(6) of the statute, the Commission has adopted N.C. Admin. Code tit. 4, r. 2S.0216 (Apr. 2002) (the Rule), which provides:

3

(a) No permittee or his employee shall allow any person to perform acts of or acts that simulate:

(1) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, or any sexual acts that are prohibited by law;

(2) the touching, caressing or fondling of the breasts, buttocks, anus, vulva or genitals;

(3) the display of the pubic hair, anus, vulva or genitals.

(b) No permittee or his employee shall allow any person to use artificial devices or inanimate objects to depict any of the prohibited activities described in Paragraph (a) of this rule.

(c) No permittee or his employee shall allow any person who exposes to public view any portion of his pubic hair, vulva, genitals, or anus to remain in or upon the licensed premises.

On December 6, 2000, the Commission sent Carandola a letter, stating, in part, that its employees had been observed (1) "simulat[ing] sexual intercourse" and "simulat[ing] masturbation" on the licensed premises in violation of § 18B-1005(a)(5) and Rule 2S.0216(a)(1); and (2) "engaging in acts of touching, caressing or fondling of the breasts" in violation of Rule § 25.0216(a)(2). The Commission asked Carandola to stipulate to these violations and to accept as a penalty either a 30-day suspension of its permits or a 15-day suspension and a $3,000 fine.

Instead, Carandola, joined by Janel D. Ralph, a dancer at the club (hereinafter collectively, Carandola), filed suit in federal court. Carandola asked the district court to declare § 18B-1005 and Rule 2S.0216 unconstitutional, both facially and as applied, and, in the interim, to issue a preliminary injunction forbidding enforcement of these provisions against them. After an evidentiary hearing, the district court

4

issued a preliminary injunction. *Giovani Carandola, Ltd. v. Bason*, 147 F. Supp. 2d 383, 393-395 (M.D.N.C. 2001). The Commission noted a timely appeal. We heard oral argument and then held this case in abeyance awaiting the Supreme Court's decision in *City of Los Angeles v. Alameda Books, Inc.*, ___ U.S. ___, 122 S. Ct. 1728 (2002).

We review a district court's grant or denial of a preliminary injunction for abuse of discretion. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975). We accept the court's findings of fact absent clear error, but review its legal conclusions *de novo*. *North Carolina v. City of Virginia Beach*, 951 F.2d 596, 601 (4th Cir. 1992).

In deciding whether to issue a preliminary injunction, a court must consider "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1992). In this case, as the district court recognized, the "irreparable harm" that Carandola alleged is "inseparably linked to [its] claim of violation of First Amendment rights[.]" *Carandola*, 147 F. Supp. 2d at 387. Determination of irreparable harm thus requires analysis of Carandola's likelihood of success on the merits, and we turn to this question first.

II.

The First Amendment bars the government from "abridging the freedom of speech" — that is, generally, "from dictating what we see or read or speak or hear." U.S. Const. amend. I; *Ashcroft v. Free Speech Coalition*, ___ U.S. ___, 122 S. Ct. 1389, 1399 (2002). The Constitution protects not just "political and ideological speech," but also "live entertainment," including "nude dancing" and other performances involving nudity or other sexual elements. *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65-66 (1981) (citations omitted); *see also Ashcroft*, 122 S. Ct. at 1400-01. Although some citizens undoubtedly find such performances offensive, preservation of the critical right of free speech, one of the Constitution's most "fundamental personal rights and liberties," *Gitlow v. New York*, 268 U.S. 652, 666

5

(1925) (internal quotation marks omitted), requires the protection of expression that some may dislike or even despise. *See Reno v. ACLU*, 521 U.S. 844, 874 (1997) ("In evaluating the free speech rights of adults, we have made it perfectly clear that [s]exual expression which is indecent but not obscene is protected by the First Amendment." (internal quotation marks and citation omitted)); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 701 (1977) ("[T]he fact that protected speech may be offensive to some does not justify its suppression.").

Keeping in mind the "preferred position" of the First Amendment free speech right, *Murdock v. Pennsylvania*, 319 U.S. 105, 115 (1943), and the scope of its protection, we address the two sets of legal principles that guide our analysis of the challenged restrictions. The first involves the nature of Carandola's overbreadth challenge and the second concerns the appropriate level of First Amendment scrutiny.

## A.

Carandola principally challenges the North Carolina restrictions as overbroad. According to Carandola, these restrictions, without justification, burden "vast amounts of constitutionally protected expression" — including dance, theater, political satire, comedy, and even performances with fully clothed performers in which sexual content is non-existent or quite limited. Brief of Appellee at 24. The Commission responds that Carandola "lack[s] standing" to bring this challenge because there is no evidence that it "desire[s] to present or act in any ballet, musical, or other serious theatrical production of any kind." Reply Brief at 4, 7. The Commission's contention rests on a fundamental misunderstanding of the overbreadth doctrine.

The overbreadth doctrine constitutes "a departure from traditional rules of standing." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Pursuant to it, an individual may "challenge a statute on its face because it also threatens others not before the court — those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (internal quotation marks and citation omitted). In this case, the overbreadth doctrine allows Caran-

dola to assert the First Amendment rights of those who do wish to "present or act" in a ballet or other theatrical production, even if Carandola does not. *See, e.g.*, *Deja Vu of Nashville, Inc. v. Metro. Gov't*, 274 F.3d 377, 387 (6th Cir. 2001).

If an overbreadth challenge succeeds, "any enforcement" of the regulation at issue is "totally forbidden." *Broadrick*, 413 U.S. at 613. This prohibition constitutes "strong medicine," however, which courts use "sparingly and only as a last resort." *Id.* Thus, "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications." *New York v. Ferber*, 458 U.S. 747, 771 (1982). Accordingly, to prevail, an overbreadth plaintiff, like Carandola, must demonstrate that a regulation's overbreadth is "not only . . . real, but substantial as well, judged in relation to the [challenged regulation's] plainly legitimate sweep," and also that no "limiting construction" or "partial invalidation" could "remove the seeming threat or deterrence to constitutionally protected expression." *Broadrick*, 413 U.S. at 613, 615.

B.

The level of First Amendment scrutiny a court applies to determine the "plainly legitimate sweep" of a regulation depends on the purpose for which the regulation was adopted. If the regulation was adopted to burden disfavored viewpoints or modes of expression, a court applies strict scrutiny. *See Texas v. Johnson*, 491 U.S. 397, 406-07, 410-15 & n.9 (1989). If, by contrast, the regulation was adopted for a purpose unrelated to the suppression of expression — e.g., to regulate conduct, or the time, place, and manner in which expression may take place — a court must apply a less demanding intermediate scrutiny. *See id.* at 406-07; *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (plurality opinion) (citations omitted); *id.* at 310 (Souter, J., concurring in part and dissenting in part).

In this case, the district court concluded that both § 18B-1005(a) and the Rule are content-based "on their face," and that "[t]he state has failed to provide sufficient evidence that the challenged statute and regulation were not purposed upon hostility towards the content of expression." *Carandola*, 147 F. Supp. 2d at 388-91. For this reason, the court applied the highest level of scrutiny — strict scrutiny.

7

We believe that the court erred in doing so. Even assuming that § 18B-1005(a)(5) of the statute[1] and the Rule do refer to content, they need withstand only intermediate scrutiny.

The Supreme Court has instructed that measures to regulate sexually explicit entertainment outside the home receive intermediate scrutiny if they are not premised on a desire to suppress the content of such entertainment, but rather to address the harmful secondary effects of such entertainment: higher crime rates and lower property values, *see Alameda Books*, 122 S. Ct. at 1736; *Boos v. Barry*, 485 U.S. 312, 320 (1988) (citing *Renton*, 475 U.S. at 48), and unwanted interactions between patrons and entertainers, such as public sexual conduct, sexual assault, and prostitution. *See California v. LaRue*, 409 U.S. 109, 110-11 (1972); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 515 (1996).[2]

---

[1] We note that the district court's order enjoins the Commission from enforcing both Rule 2S.0216 and N.C. Gen. Stat. § 18-1005 in their entirety. On appeal, Carandola does not argue that N.C. Gen. Stat. § 18B-1005(a)(1), (2), (3), or (6) (prohibiting fighting, disorderly conduct, gambling, and the like, and authorizing the Commission to write certain rules) violate the Constitution, and we see no reason to hold that they do. Accordingly, we vacate the portion of the injunction prohibiting the Commission from enforcing those subsections of the statute.

[2] However, contrary to the Commission's apparent belief, the fact that the challenged restrictions regulate liquor licenses does not affect the level of scrutiny. To be sure, the Supreme Court originally did embrace the view that the Twenty-first Amendment creates an "added presumption in favor of the validity" of state liquor regulations. *See LaRue*, 409 U.S. at 118; *see also Doran*, 422 U.S. at 932-33 (commenting that *LaRue* "concluded that the broad powers of the States to regulate the sale of liquor, conferred by the Twenty-first Amendment, outweighed any First Amendment interest in nude dancing"). However, the Court has since specifically disavowed this approach. *See 44 Liquormart*, 517 U.S. at 516 ("[W]e now disavow [*LaRue*'s] reasoning insofar as it relied on the Twenty-first Amendment."). Thus, the Court has held that "the Twenty-first Amendment . . . does not license the States to ignore their obligations under other provisions of the Constitution" or otherwise "qualify the constitutional prohibition against laws abridging the freedom of speech embodied in the First Amendment." *Id.* at 516 (citation and internal quotation marks omitted). Accordingly, the result reached in *LaRue* remains sound not because a state enjoys any special authority when it burdens speech by restricting the sale of alcohol, but rather because the regulation in *LaRue* complied with the First Amendment. *Id.* at 515; *see infra* at 17-19.

8

Such measures, the Court has explained, regulate expression only incidentally, because the expression "happen[s] to be associated" with the adverse effects the state seeks to address. *Boos*, 485 U.S. at 320. The measures are therefore "justified without reference to the content of the regulated speech" and do not receive strict scrutiny. *Renton*, 475 U.S. at 48 (quoting from *Va. Pharmacy Bd. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976)) (emphasis omitted); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 586 (1991) (Souter, J., concurring in the judgment) ("[Where] the State's interest in banning nude dancing results from a simple *correlation* of such dancing with other evils, rather than from a relationship between the other evils and the expressive component of the dancing, the interest is unrelated to the suppression of free expression." (emphasis added)); *Pap's*, 529 U.S. at 290-96 (plurality opinion) (explaining that *Renton*'s analysis of a zoning regulation also applies to other kinds of regulations affecting sites that provide sexually explicit, adult entertainment to the public); *id.* at 310 (Souter, J., concurring in part and dissenting in part).

Put another way, in this limited context, the Supreme Court does not equate reference to content with the suppression of content. *Cf. Reno*, 521 U.S. at 867-68 (rejecting argument that Communications Decency Act restrictions constituted "cyberzoning," analogous to the zoning at issue in *Renton*, because the Act aimed to "protect children from the primary effects of `indecent' and `patently offensive' speech, rather than any `secondary' effect of such speech"); *Boos*, 485 U.S. at 320-21 (rejecting argument that "our international law obligation to shield diplomats from speech that offends their dignity" is a "secondary effect" that could render a ban on protests near foreign embassies content-neutral, because the interest is defined by "the direct impact of speech on its audience").

In this case, the Commission asserts that it adopted the challenged Rule and the legislature adopted § 18B-1005(a)(5) to address secondary effects — specifically, to protect "public decency" and to prevent "disorderly conduct" and "blatant bacchanalian revelries" of the sort described by the Supreme Court in *LaRue*, 409 U.S. at 110-11.

No record evidence supports this claim.[3] For example, neither the

---

[3] In passing, the Commission suggests that the brief, vague testimony it offered at the preliminary injunction hearing of a single former legisla-

statute nor the Rule includes a preamble or any other language clearly stating a desire to address secondary effects. *Cf. Pap's*, 529 U.S. at 290 (plurality opinion) (noting that ordinance preamble stated a purpose of prohibiting entertainment that "provid [es] an atmosphere conducive to violence, sexual harassment, public intoxication, prostitution, the spread of sexually transmitted diseases and other deleterious effects"). Nor has the Commission proffered a single study of secondary effects relied upon by the legislature or Commission when they decided to adopt § 18B-1005(a)(5) and the Rule.

Even though the Commission has submitted no direct evidence of legislative motive, we believe that precedent requires us to evaluate the challenged restrictions as content-neutral provisions aimed at secondary effects. Indisputably, both § 18B-1005(a)(5) and the Rule promulgated pursuant to § 18B-1005(a)(6) comprise part of North Carolina's long-established alcohol control law, which the legislature enacted to prevent illegal and disorderly conduct that may arise where alcohol is served to the public. *See* § 18B-1005 (collecting laws superceded by current section); *see also Hart v. Ivey*, 403 S.E.2d 914, 917-19 (N.C. Ct. App. 1991), *aff'd on other grounds*, 420 S.E.2d 174 (N.C. 1992). Subsections (a)(1) through (a)(4) of that same statute require permit holders to prevent, among other things, prostitution, gambling, fights, and nudity. Subsection (a)(5) and the Rule, with their prohibitions on sexual entertainment, are most naturally viewed as companion provisions, also intended to prevent such societal ills. We note that Carandola proffers no contrary evidence of an unconstitutional motive.

For these reasons, we conclude that *one* purpose of § 18B-1005(a)(5) and the challenged Rule is to address the secondary effects that follow from lewd conduct on licensed premises, and that hostility to erotic expression, if a purpose of the restrictions at all, does not constitute the predominant purpose. Within the limited field of regulations on public exhibitions of adult entertainment, this suffices for us to treat the subsection and Rule as content-neutral and so subject only

---

tor demonstrated the North Carolina legislature's intent in enacting § 18B-1005 in the early 1980s. This argument is clearly meritless. *See United States v. Monsanto*, 491 U.S. 600, 610 (1998).

10

to intermediate scrutiny. *See Pap's*, 529 U.S. at 292 (plurality opinion) (determining that public indecency ordinance applied to nude dancing was content-neutral where "*one* purpose of the ordinance [wa]s to combat harmful secondary effects" and regulated party could not produce convincing evidence that hostility to erotic expression was predominant purpose (emphasis added)); *Renton*, 475 U.S. at 47 (observing that where "*predominate*" purpose of a city ordinance was to control secondary effects of adult entertainment this was "*more than adequate* to establish" that the city's interest is unrelated to the suppression of expression" (second emphasis added)).

## C.

In sum, then, we subject the North Carolina restrictions only to intermediate scrutiny in determining whether they adversely affect a "substantial" amount of protected speech relative to their "plainly legitimate sweep." *Broadrick*, 413 U.S. at 615.

## III.

Intermediate scrutiny is not, however, a toothless standard. It requires the government to produce evidence that a challenged regulation "materially advances an important or substantial interest by redressing past harms or preventing future ones. These harms must be `real, not merely conjectural,' and the regulation must `alleviate these harms in a direct and material way.'" *Satellite Broad. & Communications Ass'n v. FCC*, 275 F.3d 337, 356 (4th Cir. 2001) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994)).

The "appropriate focus" of this inquiry is not "the actual intent of the enacting legislature." *Barnes*, 501 U.S. at 582 (Souter, J., concurring in the judgment). A court determines "the actual intent" earlier, in selecting the appropriate level of scrutiny. In determining whether restrictions advance an important interest, a court asks only whether the government proffers evidence that the regulation serves "a *current* governmental interest." *Id.* (emphasis added); *see also Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1284-85 (10th Cir. 2002); *Jake's, Ltd. v. City of Coates*, 284 F.3d 884, 888 (8th Cir. 2002); *J&B Entm't, Inc. v. City of Jackson*, 152 F.3d 362, 371-72 (5th Cir. 1998); *Philips v. Borough of Keyport*, 107 F.3d 164, 178 (3d Cir. 1997).

11

The Commission has produced no evidence — either current or otherwise — of harmful secondary effects in North Carolina. This failure might not pose a problem if the challenged restrictions applied only to bars and clubs that present nude or topless dancing. Such entertainment has "a long history of spawning deleterious effects," including "prostitution and the criminal abuse and exploitation of young women," and in most cases a city or state need carry only a minimal burden to demonstrate its interest in regulation of such activity. *Steakhouse, Inc. v. City of Raleigh*, 166 F.3d 634, 637 (4th Cir. 1999). In particular, where "nude dancing . . . is of the same character as the adult entertainment at issue in *Renton*, *Young v. American Mini Theatres*, *Inc.*, and *California v. LaRue*," a governmental entity may rely on the "evidentiary foundation" set forth in those cases to "conclude that such nude dancing [i]s likely to produce the same secondary effects" in its jurisdiction unless the plaintiff produces clear and convincing evidence to the contrary. *Pap's*, 529 U.S. at 296-97 (plurality opinion) (internal citations shortened); *see also Alameda Books*, 122 S. Ct. at 1736, 1737 (plurality opinion) (adopting view of plurality in *Pap's* as to evidentiary requirement for adult entertainment cases); *id.* at 1741 (Kennedy, J., concurring) (agreeing with the *Alameda Books* plurality on this point, as a fifth vote).

The restrictions challenged here, however, sweep far beyond bars and nude dancing establishments. They reach a great deal of expression "in the heartland of [the First Amendment's] protection." *Carandola*, 147 F. Supp. 2d at 393. As the Commission has conceded, the plain language of the restrictions prohibits on licensed premises any entertainment that "simulate[s]" sexual behavior, even if performers are fully clothed or covered, and even if the conduct is integral to the production — for example, a political satire, a Shakespeare play depicting young love, or a drama depicting the horrors of rape. The Commission has further conceded that the restrictions have the same prohibitory effect on much non-erotic dance — such as a ballet in which one dancer touches another's buttock during a lift — and all nudity or simulated nudity, however brief, in productions with clear artistic merit — such as the Pulitzer Prize winning play, *Wit*. Furthermore, evidence before the district court indicated that the restrictions also apply to much other mainstream entertainment, including popular

12

and award-winning musicals such as *Cabaret*, *Chicago*, *Contact*, and *The Full Monty* and most kinds of jazz and flamenco dance.[4]

The Commission has offered nothing — no evidence, no judicial opinion, not even any argument — to suggest that these mainstream entertainments, to which it has conceded the restrictions apply, produce the kind of adverse secondary effects that the state seeks to prevent. Indeed, it is difficult to believe that such evidence exists. One simply does not associate these performances with disorderly behavior — whether or not alcohol is served. Nor has the Commission suggested any other state interest in burdening such entertainment. Thus, the restrictions burden these performances, and the right of North Carolinians to view them, *without any justification at all*.

The Commission has made equally fatal concessions with respect to the scope of the proscription. Specifically, it admits that it has issued 50,000 permits and that only a "small percentage" of permittees present the kind of adult entertainment that legitimately concerns the state. Among the "vast majority" of permittees that do not are coliseums, theaters, hotels, and restaurants, which instead present the kind of mainstream entertainment mentioned above, and nevertheless are burdened. Having made these admissions, the state has conceded that the challenged regulations reach a "substantial number of impermissible applications." *Ferber*, 458 U.S. at 771.

Although we certainly recognize the state's interest in preventing bar fights, prostitution, and similar problems, we see no reason for its attempt to further these interests with such broadly drawn restrictions. *See United States v. Morison*, 844 F.2d 1057, 1075-76 (4th Cir. 1988) (noting that a court considers whether a state's legitimate interest "could be achieved by a less drastic means, — that is, a method less

---

[4] As further evidence of the poor fit between the state's objective and the undiscriminating terms of its restrictions, we note that the restrictions would also punish the owners of the Charlotte Coliseum for allowing basketball players or coaches to give a congratulatory pat on the bottom during a game. While this conduct may not be protected by the First Amendment, and so we do not count it as an impermissible application, it does illustrate the extraordinary breadth of the restrictions at issue here.

invasive of free speech interests" (internal quotation marks and citation omitted)).

This case would present a different question if we could construe the challenged restrictions in a manner that removed or reduced the threat to constitutionally protected speech. *See, e.g.*, *Schultz v. City of Cumberland*, 228 F.3d 831, 850 (7th Cir. 2000) (noting that ordinance applying to theaters which "regularly feature [ ]" nudity could be enforced against "local theater[s] [that] probably would not resemble an adult-entertainment establishment in the sense contemplated by *Renton* and *Young*," and therefore adopting a saving construction, construing "regularly features" to mean "always features"). However, we cannot adopt a limiting construction unless a measure is "readily susceptible" to such an interpretation by state courts, *see Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988) (citations omitted), and certainly cannot rewrite state law. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975). Here we find no word or phrase that admits of a saving construction, and indeed, the Commission does not even suggest a possible limiting construction.

Given the Commission's failure to do so and its concessions that the challenged restrictions will burden a multitude of mainstream musical, theatrical, and dance productions — from musical comedy to ballet to political satire to flamenco dance — we have difficulty understanding the Commission's insistence that "[n]o other" statute or regulation "could be less invasive of free speech interests." Reply Brief at 7.

The Commission even asserts that the challenged statute and Rule constitute the "only means to protect its interest" in preventing societal problems. *Id.* Yet, other jurisdictions with similar concerns have adopted narrower regulations, targeting only those venues where secondary effects are likely to arise, while leaving other speech unaffected. *See, e.g.*, *Farkas v. Miller*, 151 F.3d 900, 901-03, 905 (8th Cir. 1998) (upholding a statute making it a misdemeanor to permit nudity or certain actual or simulated sex acts at a "place of business required to obtain a sales tax permit" because the statute exempted any "theater, concert hall, art center, museum, or similar establishment which is primarily devoted to the arts or theatrical performances" (citation omitted)); *see also J&B Entm't*, 152 F.3d at 376-77 (upholding zon-

14

ing ordinance that punished certain forms of nude entertainment because the ordinance contained an exemption for persons "engaged in expressing a matter of serious literary, artistic, scientific or political value").

North Carolina could have adopted restrictions containing exemptions like those in *Farkas* and *J&B*, and if it had done so, this case might well yield a different result. North Carolina has not done so, however. Accordingly, we must apply established legal principles to the restrictions the state has enacted, and with respect to those, we have little doubt that the district court did not abuse its discretion in finding that Carandola would likely prevail on its overbreadth challenge.

In fact, in recent years, the Supreme Court has strongly reaffirmed its refusal to allow even a most compelling state interest — protecting children from pornography — to justify broadly drawn regulations that sweep beyond their legitimate reach to restrict the availability of art that adults have a constitutional right to view. For example, last Term in *Ashcroft*, the Court struck down the Child Pornography Prevention Act as overbroad, despite the "repugnan [ce]" of the crime Congress sought to prevent, because the Act would also prohibit a significant amount of art, including exhibitions of the play "Romeo and Juliet," the movies "Traffic" and "American Beauty," and "hundreds of other [works] of lesser note" that explored the theme of teenage sexuality. *Ashcroft*, 122 S. Ct. at 1399-1406. Similarly, in *Reno*, the Court concluded that even the state's powerful interest in protecting minors from harmful materials did not justify "reduc[ing] the adult population . . . to . . . only what is fit for children." 521 U.S. at 874-75 (internal quotation marks and citations omitted).

For the same sorts of reasons, in recent cases involving restrictions on nudity and adult entertainment, our sister circuits have struck down broadly drawn regulations that sought to address harmful secondary effects by restricting the availability of all entertainment with sexual themes or nudity. For example, the Eighth Circuit recently invalidated as unconstitutionally overbroad a "sexual contact" ordinance that "did not exclusively cover conduct in adult entertainment businesses, which has been recognized to cause harmful secondary effects . . . but also covered conduct in any business or commercial

15

establishment, which could include theater performances, ballet performances, and many other forms of live entertainment" because there were "no findings" that such entertainment "cause[s] harmful secondary effects." *Ways v. City of Lincoln*, 274 F.3d 514, 516, 518-19 (8th Cir. 2001).

Similarly, in *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 136 (6th Cir. 1994), the Sixth Circuit struck an ordinance that prohibited "all public nudity, including live performances with serious literary, artistic, or political value" because the city "failed to present evidence linking expressive nudity in `high-culture' entertainment to harmful secondary effects." *See also Spoons, Inc. v. O'Connor*, 194 F.R.D. 589, 592-95 (N.D. Ohio 2000) (holding *Triplett* materially unaltered by *Pap's* and applying *Triplett* to enjoin as overbroad an ordinance unsupported by findings of secondary harms); *cf. Schultz*, 228 F.3d at 849 (holding an ordinance not supported by any "finding of harmful secondary effects resulting from venues outside of adult entertainment" to be overbroad but for a construction limiting its application to such venues). The overbreadth of the challenged restrictions in this case is at least as clear as the overbreadth in *Ways*, *Triplett Grille*, and *Spoons*.

Nevertheless, the Commission argues that we must uphold the challenged restrictions because they resemble part of a regulation upheld by the Supreme Court in *LaRue*, 409 U.S. 109. In *LaRue*, however, the plaintiffs did not challenge, and the Court did not consider, a regulation that the state *conceded* would burden countless mainstream entertainments. *Id.* at 119 n.5; *see also id.* at 121 (Douglas, J., dissenting) (raising only hypothetical, "conceivable" applications of the challenged regulation to protected speech in dissent). Rather, the *LaRue* Court upheld a regulation that had not yet gone into effect, on the strength of a detailed record of public hearings documenting serious problems with prostitution, public sexual conduct, and sexually transmitted disease in establishments presenting nude dancing and sexually explicit movies. *Id.* at 110-12. The regulation had never been applied to anyone, and the state had neither attempted any unconstitutional applications nor conceded that it would do so. In this context, the Court upheld the regulation but recognized both that "specific future applications of [the regulation] may engender concrete problems of constitutional dimension," and that "the sort of bac-

16

chanalian revelries that [California] sought to prevent by these liquor regulations" were not "the constitutional equivalent of a performance by a scantily clad ballet troupe in a theater." *Id.* at 118 & n.5.

In sharp contrast, here the state has expressly conceded that the challenged restrictions *do* affect a substantial amount of expression that resembles a ballet rather than "bacchanalian revelries," and therefore present the "concrete problems" that concerned the Supreme Court in *LaRue*. *Id.* at n.5.

Not only do the Commission's concessions distinguish the case at hand from the case presented to the *LaRue* Court, but they are doubly significant given the Supreme Court's subsequent reinterpretation of *LaRue*. In *44 Liquormart*, the Court clarified both the proper analysis and the appropriate scope of liquor regulations intended to protect public decency. 517 U.S. at 515-516. The Court explained that such liquor regulations must be analyzed in the same manner as any other public decency regulation — the Twenty-first Amendment gives the states no additional authority to restrict First Amendment rights. *Id.*; *see also supra* note 2. As for the scope of such regulations, the *44 Liquormart* Court characterized *LaRue* as governing the sale of alcoholic beverages "in inappropriate locations" — not in all venues that may sell liquor (including coliseums, arenas, theaters, and other sites of mainstream entertainment), as some language in *LaRue* might have suggested. 517 U.S. at 515. Only on this new rationale, the *44 Liquormart* Court concluded, could the *LaRue* "result" remain the "same." *Id.* In so ruling, the Court relied on the leading cases addressing the proper secondary effects analysis of ordinary public decency regulations. *See id.* at 515 (citing *American Mini Theatres*, 427 U.S. 50, and *Barnes*, 501 U.S. 560).

In his *Barnes* concurrence, which has been "generally adopted" as the "narrowest opinion" explaining the result reached by the divided Court,[5] Justice Souter well explained the constitutional difficulties with the restrictions at issue here. In *Barnes*, the Court upheld a pub-

---

[5] *J&B Entm't, Inc.*, 152 F.3d at 370 (citing cases); *see also Tunick v. Safir*, 209 F.3d 67, 83 (2d Cir. 2000) (separate opinion of Calabresi, J.) (citing cases in which the Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits have treated Justice Souter's opinion as the holding of *Barnes*).

lic nudity statute as applied to plaintiffs who presented and performed live, sexually explicit entertainment, but Justice Souter noted:

> [b]ecause there is no overbreadth challenge before us, we are not called upon to decide whether the application of the statute would be valid in other contexts. It is enough, then, to say that the secondary effects rationale on which I rely here would be open to question if the State were to seek to enforce the statute by barring expressive nudity in classes of productions that could not readily be analogized to the adult films at issue in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 . . . (1986). It is difficult to see, for example, how the enforcement of Indiana's statute against nudity in a production of "Hair" or "Equus" somewhere other than an "adult" theater would further the State's interest in avoiding harmful secondary effects, in the absence of evidence that expressive nudity outside the context of *Renton*-type entertainment was correlated with such secondary effects.

501 U.S. at 585 n.2 (Souter, J., concurring in the judgment).

In this case, of course, Carandola has presented an overbreadth challenge *and* the Commission *has conceded* that the restrictions burden a substantial number of mainstream entertainments, and has *not proffered* any reason at all to believe that its interest in combating secondary effects will be furthered by prohibiting the sale of liquor where serious plays or dance are performed. In such circumstances, contrary to the Commission's contention, *LaRue* offers the state no assistance. Indeed, the Supreme Court itself has explained that *LaRue* lends "no support" to an ordinance authoritatively construed by the state courts as applying to "all live entertainment" when, as in the case at hand, nothing indicates that "unusual problems are presented by live entertainment" generally. *See Schad*, 452 U.S. at 67, 73-74, n.15 (striking ordinance as overbroad and explaining that even if city could "validly place restrictions on certain forms of live nude dancing under a narrowly tailored ordinance, that would not justify the exclusion of all live entertainment . . . [including] the nude dancing involved in this case").

18

For these reasons, we conclude that the district court did not abuse its discretion in finding that Carandola would likely prevail on its overbreadth challenge.[6] Accordingly, we need not consider Carandola's alternative claims that the restrictions are unconstitutionally vague and unconstitutional as applied.

IV.

The remaining factors to be considered in awarding a preliminary injunction — the alleged irreparable injury to the plaintiff without an injunction, the potential harm to the defendant from the injunction, and the public interest — all weigh in favor of Carandola.

As to Carandola's irreparable injury, the Supreme Court has explained that "loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation omitted). We also note that Carandola faces the threat of a substantial fine and temporary suspension of its license on the basis of past conduct, and prospectively, the loss of valuable business opportunities.

With respect to the harm that would befall if the injunction is left in place, we agree with the district court that a state is "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Carandola*, 147 F. Supp. 2d at 395.

---

[6] Even before reinterpreting *LaRue*, the Supreme Court, when considering a case in precisely the same procedural posture as that at hand — review of the grant of a preliminary injunction against a public decency regulation — similarly held that the plaintiffs had made a "sufficient showing of the likelihood of ultimate success on the merits." *Doran*, 422 U.S. at 932. In *Doran*, as here, the district court had found that the challenged restriction might burden "a number of . . . works of unquestionable artistic and socially redeeming significance." *Id.* at 933 (quoting *Salem Inn, Inc. v. Frank*, 364 F. Supp. 478, 483 (E.D.N.Y. 1973)). The Supreme Court found, as we have, that such a restriction, even if constitutional as applied, could be "challenge[d] . . . on the basis of overbreadth." *Doran*, 422 U.S. at 933.

19

The final prerequisite to the grant of a preliminary injunction is that it serve the public interest. Again, we agree with the district court that upholding constitutional rights surely serves the public interest. *See id.*

Of course, as the Supreme Court noted in similarly upholding a preliminary injunction barring enforcement of another public decency statute, "the extent of our appellate inquiry" is the determination that the district court did not "abuse[ ] its discretion" in granting a preliminary injunction. *Doran*, 422 U.S. at 933. We make no prediction as to the outcome at trial but simply hold, as the Supreme Court did, that "[i]n these circumstances, and in the light of existing case law, we cannot conclude that the District Court abused its discretion by granting preliminary injunctive relief." *Id.*

V.

For the foregoing reasons, the district court's judgment is

*AFFIRMED IN PART AND VACATED IN PART.*

NIEMEYER, Circuit Judge, dissenting:

This case represents yet another effort by state and local authorities to regulate the purveyance of sexually explicit dancing in nightclubs and bars in their communities. In this case, the purveyors of such dancing in North Carolina challenge a North Carolina law prohibiting licensees who are authorized to sell alcoholic beverages from providing entertainment during which "private parts are exposed," entertainment that "includes or simulates sexual intercourse or any other sexual act," or entertainment that is otherwise "lewd or obscene." N.C. Gen. Stat. § 18B-1005.

Acting under the direction of this statute, the North Carolina Alcoholic Beverage Control Commission adopted a regulation that provides as follows:

> (a) No permittee or his employee shall allow any person to perform acts of or acts that simulate:

20

(1) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, or any sexual acts that are prohibited by law;

(2) the touching, caressing or fondling of the breasts, buttocks, anus, vulva or genitals;

(3) the display of the pubic hair, anus, vulva or genitals.

(b) No permittee or his employee shall allow any person to use artificial devices or inanimate objects to depict any of the prohibited activities described in Paragraph (a) of this Rule.

(c) No permittee or his employee shall allow any person who exposes to public view any portion of his pubic hair, vulva, genitals or anus to remain in or upon the licensed premises.

4 N.C. Admin. Code, tit. 4, r.2S.0216 (2002).

When Christie's Cabaret, a nude dancing establishment in Greensboro, North Carolina, was charged with violation of the statute and regulation, it, together with a dancer, commenced this action facially challenging the prohibitions as unconstitutional. Without challenging their violation of the statute, they argue that the statute and regulation deny them the right to free speech under the First and Fourteenth Amendments to the United States Constitution.

The district court preliminarily enjoined enforcement of the North Carolina law. For the reasons that follow, I would reverse.

In writing to affirm, the majority seeks to protect the offensive conduct which concededly violates both the statute and the regulation by concluding that the statute and regulation are unconstitutionally overbroad. It relies on an array of Supreme Court decisions that fail to dispose of the issue before us. With respect to the one dispositive case, *California v. LaRue*, 409 U.S. 109 (1972), the majority refuses to follow the decision through an effort to distinguish it.

In *LaRue*, the Supreme Court was faced with a statute virtually identical to the one before us and found it constitutional against a facial challenge that it violated the First and Fourteenth Amendments. The Supreme Court observed that "as the mode of expression moves from the printed page to the commission of public acts that may themselves violate valid penal statutes, the scope of permissible state regulations significantly increases." 409 U.S. at 117. In concluding that the California law before it was constitutional, the Court explained that the State had more latitude in regulating nude dancing because the restrictions were imposed in connection with liquor licenses:

> The substance of the regulations struck down prohibits licensed bars or nightclubs from displaying, either in the form of movies or live entertainment, "performances" that partake more of gross sexuality than of communication. While we agree that at least some of the performances to which these regulations address themselves are within the limits of the constitutional protection of freedom of expression, the critical fact is that California has not forbidden these performances across the board. It has merely proscribed such performances in establishments that it licenses to sell liquor by the drink.

> Viewed in this light, we conceive the State's authority in this area to be somewhat broader than did the District Court.

*Id.* at 118.

In seeking to distinguish the Supreme Court's holding, the majority points out that the State in *LaRue* did not concede the argument, as did the State in this case, that the language of the statute could reach some main street establishments. Whether a legal argument is conceded or not, however, does not affect the Supreme Court's holding, which reviewed the statute, not the legal arguments. Moreover, the Supreme Court addressed the concession made in this case, observing that the prohibition was constitutional even though "some of the performances to which these regulations address themselves are within the limits of constitutional protection." *Id.* at 118.

The majority also seeks to distinguish *LaRue* on the ground that the Court in *LaRue* affirmed the statute "on the strength of a detailed

22

record of public hearings documenting serious problems with prostitution, public sexual conduct, and sexually transmitted disease in establishments presenting nude dancing and sexually explicit movies." *Ante* at 16 (citing *LaRue*, 409 U.S. at 110-12). But the fact that the record here was not as complete as the one in the California context cannot mean that the effects of sexually explicit conduct in North Carolina would be different on the community than sexually explicit conduct in California. The sexual appetite is a fact of the human condition everywhere. And the cases are replete in acceptance of the ill effects and moral degradation caused by such sexually explicit conduct in bars and nightclubs. *See, e.g.*, *City of Newport, Ky. v. Iacobucci*, 479 U.S. 92, 96 (1986); *New York State Liquor Auth. v. Bellanca*, 452 U.S. 714, 717-18 (1981) (recognizing the potential for "disturbances associated with mixing alcohol and nude dancing").

Finally, the majority suggests that *LaRue* is no longer good law because it was "reinterpreted" in *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996). This argument, however, is simply based on a misreading of *44 Liquormart*. In that case, the court "disavowed" only the reasoning in *LaRue* that depended on the Twenty-first Amendment to support its holding. The Court was careful to state that it did not "question[ ] the holding" of *LaRue* as it applied the First and Fourteenth Amendments. *See 44 Liquormart*, 517 U.S. at 516. Indeed, the Court pointed out that it would have reached "precisely the same result [in *LaRue*] if it had placed no reliance on the Twenty-first Amendment." *Id.* at 515.

The other circuit courts that have been faced with the exact issue presented in this case have held, as I would, that the holding in *LaRue* remains binding precedent with respect to similarly worded statutes. *See, e.g.*, *BZAPS, Inc. v. City of Mankato*, 268 F.3d 603, 608 (8th Cir. 2001) ("Because the Supreme Court has refused to reject the holding of *LaRue*, the case remains precedent that we are obliged to apply to similar cases"); *Sammy's of Mobile, Ltd. v. City of Mobile*, 140 F.3d 993, 996 & n.5 (11th Cir. 1998) (applying *LaRue* because *44 Liquormart* held that *LaRue* would have had the same outcome even if the Twenty-first Amendment reasoning had not been applied).

For these reasons, I would reverse the entry of the preliminary injunction, and therefore, I respectfully dissent.