**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 07-1665**

_____

MCDOOGAL'S EAST, INCORPORATED; WILLIAM J. STEINER,

        Plaintiffs - Appellants,

     v.

THE COUNTY COMMISSIONERS OF CAROLINE COUNTY, John W. Cole,
President, Roger L. Layton, Vice President, Mario J.
Gangemi, Commissioner, Roads Board Chairman, In their
official capacity,

        Defendant - Appellee.

_____

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  William D. Quarles, Jr., District
Judge.  (1:05-cv-01517-WDQ)

_____

Argued: May 12, 2009          Decided: August 28, 2009

_____

Before TRAXLER, Chief Judge, AGEE, Circuit Judge, and Malcolm J.
HOWARD, Senior United States District Judge for the Eastern
District of North Carolina, sitting by designation.

_____

Affirmed by unpublished opinion.  Judge Agee wrote the opinion,
in which Chief Judge Traxler and Senior Judge Howard joined.

_____

**ARGUED**: Howard J. Schulman, SCHULMAN & KAUFMAN, LLC, Baltimore,
Maryland, for Appellants.  Kevin Bock Karpinski, KARPINSKI,
COLARESI & KARP, PA, Baltimore, Maryland, for Appellee.  **ON
BRIEF**: Daniel P. Doty, SCHULMAN & KAUFMAN, LLC, Baltimore,

Maryland, for Appellants. Victoria M. Shearer, KARPINSKI, COLARESI & KARP, PA, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

William J. Steiner ("Steiner") appeals the grant of summary judgment by the United States District Court for the District of Maryland in favor of the County Commissioners of Caroline County, Maryland ("the County Commissioners"), holding that certain zoning enactments ("the Moratorium" and "the Ordinance" which are hereinafter defined, collectively "the Enactments") did not improperly infringe on Steiner's rights under the First Amendment of the United States Constitution. Steiner argues that the Enactments are unconstitutional because the predominant intent was to limit his protected First Amendment right of expression and that the evidence of negative secondary effects of adult-oriented businesses ("AOBs") does not reasonably support the zoning scheme adopted by the County Commissioners. For the following reasons, we affirm the judgment of the district court.

I.

A.

Caroline County, Maryland ("the County") is a rural county in eastern Maryland with a population of about 30,000 residents.[1]

---

[1] For convenience, unless an action by the County Commissioners is at issue, we will simply refer to the County as the relevant entity.

In 2005, the County began the process of revising its comprehensive plan, as its land-use plan had not been updated for over a decade and its zoning ordinance had not been revised for over two decades. Elizabeth Krempasky ("Krempasky"), the Director of Planning and Codes Administration for the County from 1985 to 2006, oversaw the revision process.

As early as 2001, the County's attorney suggested that the County should address the zoning of AOBs. Krempasky testified that in 2001 she realized that the County had no AOB regulations, and that the County should "have some adult business regulations, even though at that time [they] didn't have adult business [sic] that was actually proposing to operate in Caroline County." J.A. 99. Prior to 2005, there had never been an AOB in the County.

In 2004 Steiner became interested in purchasing a property in the County, which was then being operated as a sports bar under the name of The 19th Hole. Intending to convert The 19th Hole to an AOB, Steiner entered into a contract to purchase it on March 8, 2005.

To operate as an AOB, Steiner determined that he needed to obtain a Special Use Exception from the County Board of Zoning Appeals. According to Steiner, when County officials learned of his interest in operating The 19th Hole as an AOB, they began to prepare the Moratorium, an ordinance that would prevent the

4

approval of the site as an AOB during the period the Moratorium was in effect. Steiner asserts that the specific purpose of the Moratorium was to prevent him from opening an AOB, and that the County Commissioners and County employees, including Krempasky, intentionally did not tell him about the plans for the Moratorium. The County contends that the Moratorium was enacted solely to give the County more time to consider proper permanent zoning regulations for AOBs.

On March 9, 2005, Steiner obtained an Occupancy Permit, an application for a Special Use Exception, submitted a site plan, and obtained an application for Water Supply and/or Sewage Verification. On March 10, Krempasky sent an e-mail to the County's attorney, informing him of these activities and urging the completion of the Moratorium documents. On April 4, Steiner received approval for the site plan and submitted the Special Use Exception application.

The Caroline County Planning Commission ("Planning Commission") held a public hearing for consideration of the Moratorium on April 13, 2005. At the hearing, "maps of the locations in the County where adult businesses could locate under the temporary Moratorium Ordinance were provided to the Planning Commission members." Br. of Appellee 4. The Moratorium imposed a ban on approval of applications, site plans, or permits for AOBs for six months, restricted the available

5

locations for AOBs, and required particular setback requirements and advertising restrictions. Under the terms of the Moratorium, The 19th Hole property was in a zoning district where AOBs were not permitted to locate.

The minutes from the Planning Commission meeting show a discussion of the "adverse secondary effects associated with adult oriented businesses," and that "[t]he County, through zoning, cannot totally ban all adult oriented business from its jurisdiction." J.A. 1944-45. An e-mail from the County's attorney reflects that in drafting the Moratorium, First Amendment factors were a consideration: "[a] moratorium on an adult oriented business . . . is particularly difficult to fashion because it could be construed as a prior restraint on free speech . . . which is clearly unconstitutional . . . ." J.A. 2359-60. The text of the Moratorium as adopted states that there are "secondary effects issues" associated with AOBs and that the "County requires time to ensure that the desired public input can be obtained before establishing more enduring textual amendments to the Zoning Ordinance . . . ." J.A. 65.

The Moratorium was unanimously adopted by the Planning Commission on April 13, 2005, and then enacted by the County Commissioners on April 19, 2005. Steiner's application for a Special Use Exception had not been approved as of the effective date of the Moratorium, April 30, 2005.

Steiner argues that he did not know about the Moratorium until after its enactment, and that Krempasky specifically was directed by the County's attorney not to tell him about it unless asked. Instead, the County's attorney advised Krempasky that she should send Steiner a letter informing him of the Moratorium.

Krempasky wrote Steiner a letter, dated April 22, 2005, which notified him that the Moratorium had been adopted and provided him a copy. However, Steiner had learned the day before from his realtor that the Moratorium had been enacted. Krempasky's letter also notified Steiner that the Special Use Exception application could not be processed because it was incomplete in many respects, but that the Moratorium "prohibits the location of an adult oriented business at the site you have proposed" but "there are a number of locations in Caroline County where an adult oriented business may be located." J.A. 2139-40.

The Ordinance, the permanent amendment to the County's zoning ordinance, was enacted by the County Commissioners on September 17, 2005, and provides that an AOB can only be located in the I-2 (light industrial) zoning district.[2] The Ordinance

---

[2] The Ordinance and Moratorium differed in the designated zoning districts where AOBs could locate. The Moratorium did not permit locating in an I-2 district, but permitted AOBs in a
(Continued)

7

also contains setback requirements for AOBs which must be at least 1200 feet from "the closest boundary of a parcel containing a school, place of worship, park or recreation facility, day care center, family or day care center, [or] group," 600 feet from "the boundary of any parcel in a residential zoning district," 1200 feet from "the closest portion of any other building or structure containing an adult oriented business," and 1200 feet from "the closest portion of any building or structure where alcoholic beverages are sold for on-premises consumption." J.A. 79.

The preamble to the Ordinance states the County's goals and intent in enacting the Ordinance, particularly that the County is "concerned with the potential adverse secondary effects of adult oriented businesses" and noting the numerous "studies prepared by or for other local governments and in reported opinions in the various jurisdictions of the United States [that] provide pertinent information about the adverse secondary effects . . . ." J.A. 70. The preamble further states that the "[i]ntent and [p]urpose" of the County was to draft the ordinance "as a content neutral time, place and manner restriction[] designed to minimize the harmful secondary effects

C-1 (neighborhood commercial) or C-2 (general commercial) district.

8

associated with Adult Oriented Businesses while providing and preserving reasonable alternative channels of communication for those interested in engaging in adult oriented communication protected by the federal and State constitutions." J.A. 75.

B.

On October 24, 2005, Steiner filed a complaint against the County Commissioners in the United States District Court for the District of Maryland, alleging that the Enactments violated his First Amendment rights, and seeking damages and injunctive and declaratory relief. The district court granted summary judgment to the County Commissioners, holding that the Enactments were content-neutral time, place, and manner regulations, served a substantial government interest, and allowed for reasonable alternative avenues of communication.

On appeal, Steiner first argues that the district court used the incorrect standard of scrutiny to review the Enactments.[3] While facially neutral ordinances are typically

---

[3] The County Commissioners initially argue that Steiner's challenge to the Moratorium is moot because it is "no longer in effect and has not been in effect since 2005." Br. of Appellee 14. The district court rejected this argument, ruling that "[a]s Steiner has alleged a continuing injury caused by the Moratorium, his challenge is not moot." J.A. 44. We agree with the district court. If Steiner were to succeed on appeal, he could have a claim for damages resulting from the enactment of the Moratorium, which prevented him from establishing a lawful
(Continued)

evaluated under the intermediate scrutiny standard, Steiner contends the Enactments should have been evaluated under the standard of strict scrutiny because the predominant intent of the Enactments was to limit expression, and not to limit the negative secondary effects of AOBs.  Alternatively, Steiner contends that even if the intermediate standard of scrutiny is applied, the County's evidence does not fairly and reasonably support its rationale of prohibiting AOBs in rural and agricultural areas, and thus does not pass constitutional muster.  Lastly, Steiner argues that a fact finder could decide that the Enactments do not leave reasonable alternative means of expression for AOBs available in the County.

On appeal, this Court reviews a district court's grant of summary judgment de novo. Nguyen v. CNA Corp., 44 F.3d 234, 236 (4th Cir. 1995).  Steiner filed a timely notice of appeal and we have jurisdiction pursuant to 28 U.S.C. § 1291.

---

non-conforming use prior to the enactment of the Ordinance. See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 438 n. 7 (1985) (holding that, because Plaintiff requested damages, the claim in that case was not moot even though the relevant regulation had been subsequently changed); Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 387 (6th Cir. 2005) ("[T]he existence of a damages claim ensures that this dispute is a live one and one over which Article III gives us continuing authority."); Jersey Cent. Power & Light Co. v. State of NJ, 772 F.2d 35, 41 (3d Cir. 1985) ("[T]he availability of damages or other monetary relief almost always avoids mootness.").

The level of scrutiny a court applies to a legislative enactment in a First Amendment analysis depends on whether the statute is deemed content-based or content-neutral. A content-based statute "would be considered presumptively invalid and subject to strict scrutiny." City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 434 (2002). However, a content-neutral statute is "properly analyzed . . . as a time, place, and manner regulation" and receives intermediate scrutiny. Id.

Steiner argues that the district court erred in evaluating the Enactments under an intermediate scrutiny standard. Even though Steiner acknowledges the Enactments are content-neutral on their face, he claims that is a pretext, see Reply Br. of Appellant 13, and the predominant intent of the County Commissioners was to limit expression and not the limitation of the harmful secondary effects of AOBs. As evidence to support this contention, Steiner points to e-mails and communications that he claims show that his applications to facilitate the use of The 19th Hole as an AOB were intentionally delayed so the Moratorium could be passed, and that the County Commissioners sought to effectively ban AOBs through the Enactments. The County Commissioners respond that they intended to "enact a content neutral ordinance" and that "[i]t is not the intent of

11

the County Commissioners to suppress any speech protected by the First Amendment to the United States Constitution . . . ." J.A. 75.

The district court held that, because the Enactments restricted AOBs to specific areas, similar to the regulatory method in City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986), the Enactments "are properly analyzed as [] form[s] of time, place, and manner regulation[s]." J.A. 45. The district court also disagreed with Steiner's predominant intent argument, determining that "[n]o reasonable fact finder could find that the predominate [sic] concern of the Commissioners was to restrain the form of expression to be shown at AOBs on the basis of its content. Accordingly, the Zoning Enactments will be subjected to intermediate scrutiny . . . ." J.A. 50. We find no error in the district court's application of intermediate scrutiny.

A statute or other regulatory enactment, such as the Enactments at issue in this case, may treat AOBs differently from other entities so long as the ordinance is not aimed at the content of the AOBs but instead enacted to limit their harmful secondary effects. Renton, 475 U.S. at 47. "Such measures . . . regulate expression only incidentally, because the expression 'happen[s] to be associated' with the adverse effects the state seeks to address." Giovani Carandola, Ltd. v. Bason, 303 F.3d

12

507, 513 (4th Cir. 2002) (quoting <u>Boos v. Barry</u>, 485 U.S. 312, 320 (1988)).  Moreover, the Supreme Court has further held that a facially neutral ordinance that does "not ban adult theaters altogether" is "properly analyzed . . . as a time, place, and manner regulation." <u>Alameda Books</u>, 535 U.S. at 434.  Such "content-neutral" regulations are not subject to strict scrutiny and "are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." <u>Renton</u>, 475 U.S. at 47.

Nonetheless, an ordinance may still be subject to strict scrutiny if, regardless of its facial neutrality, the predominant intent of law-makers in enacting the regulation was to limit expression and not to limit harmful secondary effects. <u>See</u> <u>id.</u> at 48.  It would be erroneous, however, to read "predominant intent" as merely a motivating factor in a legislative enactment. <u>See</u> <u>id.</u> at 47.

In <u>Renton</u>, the Supreme Court reversed the holding of the Ninth Circuit that if *a* "motivating factor" in the adoption of an ordinance was to restrict speech, that factor alone was sufficient to invalidate the ordinance. <u>Id.</u> at 47-48.  Instead, as we explained in <u>Carandola</u>, a legislative provision is constitutionally valid if "one purpose of [an ordinance] is to address the secondary effects that follow from lewd conduct . . ., and that hostility to erotic expression, if a purpose of the

13

restrictions at all, does not constitute the predominant purpose." Carandola, 303 F.3d at 515. This is because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." Renton, 475 U.S. at 48 (internal citations omitted). Accordingly, a court "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." Id. at 48 (internal citations omitted).

In Renton, as evidence in support of the contention that the predominant intent of law-makers was not to suppress speech, the Court noted that the ordinance at issue did not restrict the number of AOBs, but instead only limited their location to certain areas. The Court reasoned that if the city's predominant intent were to suppress the message conveyed by AOBs, the city would have sought to restrict their number, rather than restrict their possible locations. Id. at 48. Similarly, in the case at bar, the Commissioners did not attempt to ban all AOBs through the Enactments. Indeed, the County's attorney explicitly advised that it "was unwise to completely ban adult oriented business . . . because such a ban probably would be construed as an unconstitutional prior restraint of protected speech." J.A. 2368. Instead, the County Commissioners limited AOBs to certain zoning districts and instituted setback

14

rules in relation to other specific uses, such as residences and schools.

The Enactments state in detail their purpose in limiting the negative secondary effects of AOBs. This statement of legislative intent parallels the recognition by the Renton Court that "[t]he ordinance by its terms is designed to [limit negative secondary effects]." Renton, 475 U.S. at 48 (emphasis added). The Moratorium states that it is being enacted in response to the "significant . . . secondary effects issues surrounding or arising from the location and operation of [AOBs]." J.A. 65. The Ordinance states that the County "developed the textual amendments in this Ordinance as content neutral time, place and manner restrictions designed to minimize the harmful secondary effects associated with Adult Oriented Businesses . . . ." J.A. 75; see Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson County, Kan, 492 F.3d 1164, 1173 (10th Cir. 2007) (citing a similar preamble as evidence that "the Board's predominant purpose in enacting [the ordinance] was to regulate the secondary effects of adult businesses").

The Ordinance also recites a number of the negative secondary effects: the risk that AOBs "take advantage of underage persons," "increase the spread and the rate of . . . sexually transmitted diseases," "lead to the proliferation of" crime, "devalue surrounding residential and commercial

15

properties," and drive "away legitimate . . . community members." J.A. 74-75. In Carandola, we held that even though the North Carolina Alcohol Beverage Control Commission did not proffer "a single study of secondary effects," and neither "the statute nor the Rule include[] a preamble or any other language clearly stating a desire to address secondary effects," precedent nonetheless "requires us to evaluate the challenged restrictions as content-neutral provisions aimed at secondary effects." Carandola, 303 F.3d at 514. Here, the Ordinance made extensive reference to a number of studies from across the United States that establish the harmful secondary effects of AOBs.

It is evident from the plain language of the Enactments, the studies proffered in the Ordinance, and the fact that AOBs are not banned under the Enactments, that the predominant intent of the County Commissioners was not primarily to suppress speech. By focusing on the harmful secondary effects, the Enactments are "justified without reference to the content of the regulated speech." Renton, 475 U.S. at 48 (internal quotation and citation omitted). We therefore agree with the district court that the Enactments are properly reviewed as content-neutral and are to be analyzed under an intermediate scrutiny standard.

16

B.

Having determined that the district court correctly decided that intermediate scrutiny was the proper standard of review, we next undertake to determine whether the zoning scheme of the Enactments satisfies that standard. That is to say, we examine whether the Enactments are "designed to serve a substantial governmental interest and allow[] for reasonable alternative avenues of communication." Renton, 475 U.S. at 50.

With regard to the substantial government interest prong, Steiner does not contest that preventing the proven harmful secondary effects of AOBs is a substantial governmental interest. Id. at 48; see also Carandola, 303 F.3d at 516. Instead, Steiner argues that the secondary effects studies relied on by the County failed to establish those effects in rural counties as opposed to more urban areas. Steiner also argues that "a reasonable jury could conclude that the County's evidence does not fairly and reasonably support its rationale of prohibiting AOBs in rural and agricultural areas and restricting them to areas immediately next to the County's population centers in proximity to clusters of residences, schools, churches and parks." Br. of Appellant 42-50. Specifically, Steiner contends that because the studies cited by the County generally showed that AOBs should be kept separate from residential areas, it was irrational for the County to allow

17

them in zoning districts near residential areas, and thus the County did not actually rely on the cited studies: "[a] reasonable jury could conclude that the County's rationale is based on 'shoddy . . . reasoning,' if not a lack of common sense." Id. at 47 (quoting Alameda Books, 535 U.S. at 438–39).

Citing Carandola, the district court held

> the Commissioners may rely on the evidentiary foundation established in Renton to conclude that nude dancing "is likely to produce the same secondary effects in [Caroline County] unless the plaintiff produces clear and convincing evidence to the contrary." Moreover, the Commissioners were entitled to rely on the experiences and findings of other cities. As Steiner has not offered evidence suggesting that an AOB would not have those effects in Caroline County, nothing in the record controverts the evidence upon which the Commissioners relied. Accordingly, the Commissioners have a substantial interest in controlling the secondary effects of AOBs.

J.A. 50-51 (quoting Carandola, 303 F.3d at 516) (internal citations omitted).

The district court thus rejected Steiner's contention that the County's evidence, particularly the secondary effects studies, failed to establish the necessary foundation of possible harmful effects by AOBs in the County. The district court concluded that "it is clear from the evidence that the Commissioners designed the Zoning Enactments to combat the secondary effects . . . ." J.A. 51.

The district court also rejected Steiner's contention that the zoning choices made in the Enactments by the County

18

Commissioners invalidated the Enactments. The district court found that "the Commissioners could have chosen to disperse or concentrate AOBs" and that "'[i]t is not [the court's] function to appraise the wisdom of [the Commissioners'] decision' as to the exact methods of regulation." J.A. 51 (quoting Renton, 475 U.S. at 52). The district court concluded that "no reasonable fact finder could find that the Zoning Enactments do not serve the substantial governmental interest in controlling the secondary effects of AOBs." J.A. 51.

As to the contention by Steiner that the Enactments did "not provide for adequate alternative avenues of expression," Br. of Appellant 51, the district court noted that "Steiner does not directly challenge the reasonableness of the overall quantity of land available; instead Steiner argues that an unreasonably small amount of land is left for AOBs once setbacks and other considerations are considered." J.A. 52. Citing the example of available locations in Renton and the record evidence of available AOB locations under the Enactments, the district court held that "no reasonable fact finder could find that the Zoning Enactments fail to allow reasonable alternative avenues of communication." J.A. 55.

We find no error in the district court's judgment.

19

1.

a.

The County introduced into evidence hundreds of pages of studies conducted in many different localities across the United States, which were considered by the County Commissioners in the process of adopting the Ordinance.[4]  These studies are cited in the preamble to the Ordinance, and were before the Commissioners in formulating the Ordinance.  The studies come to essentially the same conclusions about the negative secondary effects of AOBs, finding an increase in crime, a decrease in nearby housing values, and an increase in perceived danger by residents.  The negative secondary effects of AOBs are plain based on these studies in the record.

To minimize the negative effects of AOBs, the studies recommend many similar courses of action, including setbacks, dispersion of AOBs, and requiring that AOBs be located in certain types of zones.  Because nearly every study reaches the

_____

[4] The studies included those from Manatee County, Florida, Minneapolis, St. Paul, Las Vegas, Cattaraugus County, New York, the Town of Islip, New York, New York, New York, New Hanover County, North Carolina, the City of Austin, Texas, Hamilton County, Tennessee, Amarillo, Texas, the City of Beaumont, Texas, Dallas, Texas, El Paso, Texas, Houston, Texas, Newport News, Virginia, City of Bellevue, Washington, Des Moines, Iowa, Seattle, Washington, and St. Croix County, Wisconsin.

same conclusion about setbacks,[5] there is support in the record for the principle that setbacks are necessary between AOBs and other AOBs and between AOBs and certain uses, such as churches, schools, and parks. Some of the studies concluded that AOBs should be dispersed throughout a community,[6] while other studies recommend that AOBs be located in industrial, light-industrial,

---

[5] The St. Paul study provided for setbacks between AOBs and residential zones and "protected uses" such as schools, churches, libraries, and the like. The Cattaraugas County study concluded that there should be a "safe buffer" between AOBs and the "most sensitive land uses, such as residences, churches, schools, historic resources and the central business district." J.A. 881. The City of Beaumont study found that AOBs should not be within 500 feet of the boundary line of a residential district, that they should not be within 300 feet of another AOB, and that an AOB should not be within 1000 of a church, school, public park, or other recreational facility. The proposed Newport News, Virginia, ordinance required that there be a 500 foot setback between AOBs and schools, churches, parks, playgrounds, libraries, or other AOBs.

[6] The Bellevue study found that multiple approaches could be used with success, including dispersion approaches, concentration approaches, modified dispersion/concentration approaches, and "special" approaches. J.A. 1577-78.

Alternatively, the St. Paul study recommended that there should be "an increase in the spacing between [AOBs] to minimize the danger that a cluster of [AOBs] could develop in a single part of the city." J.A. 774. The Cattaraugas County study concluded that the "common regulatory response to mitigate the possible negative effects" is to ensure that AOBs are dispersed from one another. J.A. 881. The New Hanover County study found that the "best zoning approach is dispersal" of AOBs. J.A. 1119. The Austin study found that AOBs should be "dispersed to avoid the over concentration of such business." J.A. 1156. The Des Moines and St. Croix studies also recommended that AOBs be dispersed.

or commercial zones and that some sort of permit process be required.[7]

b.

The County followed many of the studies' findings in crafting the Enactments. The Ordinance limits the location of AOBs to I-2 zones, which are the County's "light industrial" districts. The Moratorium limited AOBs to certain commercial zoning districts, C-1 and C-2. The Moratorium also imposed a setback provision, which requires that an AOB be 1000 feet from a major highway, 2000 feet from a school, 400 feet from a place of worship, and 400 feet from a residence. The setback provisions in the Ordinance require that an AOB be 1200 feet

---

[7] The Cattaraugas County study concluded that AOBs should be located in industrial and light-industrial zones. The Minneapolis study found that municipalities "should avoid locating sex businesses in residential areas" and that AOBs should be "permitted only in locations that are at least 1/10 of a mile from residential areas (about 500 feet)." J.A. 721-22. AOBs should be "located in large commercial zones in various parts of [a municipality]" because it is the commercial area of a municipality is where assaults and street robberies already tend to occur. J.A. 724. The New Hanover County study found that AOBs should be limited to "commercial and/or industrial zones" or by a Special Use Permit or licensing process. J.A. 1119-20. The Austin study found that AOBs should be "limited to highway or regionally-oriented zone districts," and that conditional use permits should be required. J.A. 1156. The Amarillo study recommended that a permit and license mechanism should be developed. The proposed Newport News ordinance required that AOBs be limited to Commercial and Business District zones, and that conditional use permits be required. The St. Croix study recommended that AOBs be located in commercial zones, and have licensing requirements.

from "the closest boundary of a parcel containing a school, place of worship, park or recreation facility, day care center, family or day care center, group." J.A. 79.   It also requires that the an AOB "shall not be within [600] feet of the boundary of any parcel in a residential zoning district," and that an AOB "shall be at least [1200] feet" from another AOB or a building "where alcoholic beverages are sold for on-premises consumption." J.A. 79-80.

The vast majority of the studies institute some sort of setback scheme, which the County obviously followed.  Clearly, the County had some reliance on the studies for the proposition that setbacks are necessary between AOBs and other types of protected uses.

The County also appeared to rely on the studies' conclusions that AOBs should be located in commercial or industrial zones, not residential zones, as the plain terms of the Enactments reflect.   With regard to the Ordinance, the County argues that it "decided that it could best deal with the problem of adverse secondary effects of adult businesses by locating the adult businesses in the I-2 zone (where residences have never been permitted), near the towns, but with setbacks to keep them reasonably separated from churches, schools, parks,

23

and residences." Br. of Appellee 43-44.[8]  In recommending AOBs be restricted to the I-2 zone, the Planning Commission specifically noted the rationale for that zoning choice, which was later adopted by the County Commission through the Ordinance:

> [T]he adverse secondary affects [sic] based on the studies . . . are most closely related to where there are existing residences and community facilities, such as churches, schools, etcetera.  And the I-2 Zoning District does not allow new dwelling units by right. Any new dwelling unit has to be permitted only by Special Use Exception there.  [T]hat zoning district was designed to preclude residential developments. Where as our Commercial Zoning Districts allow residential dwelling units by right. . . .    And therefore, the . . . negative affect [sic] on property values . . . is actually . . . greater in Commercial Districts.  So . . . the setbacks that have been established in the Draft Regulations can be more easily complied with in the . . . I-2 Zone.

J.A. 1979-80.  Preventing AOBs from being adjacent to all residential uses could not be achieved except in an I-2 zone, the "only zoning district in which residences have never been permitted . . . ."  Br. of Appellee 42.

Thus, the Enactments reflect the County's choice of zoning districts for AOBs to be in line with the vast majority of the

---

[8] It is worth noting that the County's change of zoning district from C-1, C-2 under the Moratorium to I-2 under the Ordinance is a rational choice.  If for no other reason, the I-2 selection in the Ordinance could be said to lessen the likelihood of residential factors affecting AOBs since the I-2 district prohibits residential development, but the C-1 and C-2 districts do not.

study recommendations for AOB zoning. Locating AOBs in an industrial zone, like the County's I-2, particularly where residential development is prohibited, appears to be a reasoned determination. That the locality is rural and not urban would seem irrelevant as the primary distinguishing factor is the type of zoning district, which would be the same whether it was I-2 in a rural county or I-2 in an urban area. Further, it is the activity being regulated, AOBs, that drive the restrictions regardless of the rural, urban, or suburban nature of the local government. We noted this general point in Carandola, that it is the AOB activity which produces the secondary effects, regardless of where that may be:

> where "nude dancing . . . is of the same character as the adult entertainment at issue in Renton, Young v. American Mini Theatres, Inc., and California v. LaRue," a governmental entity may rely on the "evidentiary foundation" set forth in those cases to "conclude that such nude dancing [i]s likely to produce the same secondary effects" in its jurisdiction unless the plaintiff produces clear and convincing evidence to the contrary.

Carandola, 303 F.3d at 516 (quoting City of Erie v. Pap's A.M., 529 U.S. 277, 296-97 (2000)).

The Enactments thus adopt many of the standard measures used by other localities to minimize the adverse secondary effects of AOBs. See, e.g., Renton, 475 U.S. 43 (affirming ordinance requiring 1000-foot setbacks); Young v. American Mini Theatres, Inc., 427 U.S. 50, 62 (1976) (upholding validity of

25

ordinance that utilized 1000-foot setbacks between AOBs, and 500-foot setbacks between an AOB and a residential area); Independence News, Inc. v. City of Charlotte, 568 F.3d 148, 151 (4th Cir. 2009) (upholding validity of ordinance that limited AOBs to business, "mixed use," and industrial zones and instituted setbacks).

We thus conclude that Steiner's argument that the County improperly relied on the studies because they were mostly from urban, rather than rural, environments is without merit. Moreover, the Renton Court responded to an analogous argument from the AOB operator in that case, namely that the Renton ordinance improperly relied on studies generated by other municipalities that did not relate to "the particular problems or needs of Renton." Renton, 475 U.S. at 50 (internal citations omitted). The Court held that "Renton was entitled to rely on the experiences of . . . other cities" because

> [t]he First Amendment does not require a city, before
> enacting such an ordinance, to conduct new studies or
> produce evidence independent of that already generated
> by other cities, so long as whatever evidence the city
> relies upon is reasonably believed to be relevant to
> the problem that the city addresses.

Id. at 51-52.

For the foregoing reasons, we find no merit in Steiner's arguments that the Enactments do not serve a substantial government purpose either because the secondary effects studies

26

were primarily from urban areas or the County's choice of zoning districts for AOBs raised some type of constitutional deficiency.

c.

While we find no merit in the substance of Steiner's arguments, it is also important to note that court oversight of the legislative choices by local governments regulating AOBs is limited. The Supreme Court has held that municipalities should be given a certain amount of discretion in determining a zoning scheme regulating AOBs, "specifically refus[ing] to set . . . a high bar for municipalities that want to address merely the secondary effects of protected speech." Alameda Books, 535 U.S. at 438 (citing Renton, 475 U.S. at 51-52. Although "[t]he municipality's evidence must fairly support the municipality's rationale for its ordinance," Alameda Books, 535 U.S. at 438, the municipality need not demonstrate "with empirical data . . . that its ordinance will successfully lower crime. . . . Such a requirement would go too far in undermining our settled position that municipalities must be given a 'reasonable opportunity to experiment with solutions' to address the secondary effects of protected speech." Id. at 439 (quoting Renton, 475 U.S. at 52).

This deference to a municipality's proposed zoning plan "is the product of a careful balance between competing interests. On the one hand, [a court has] an obligation to exercise

27

independent judgment when First Amendment rights are implicated. . . . On the other hand, [a court] must acknowledge that [a municipality] is in a better position than the judiciary to gather and evaluate data on local problems." Alameda Books, 535 U.S. at 440 (internal quotations and citations omitted).

The County did adopt commonly approved AOB limitation measures such as the zoning concentration and setbacks from protected uses, as described above. That the Commissioners chose to preserve more rural environments and concentrate AOBs in industrial zones closer to the towns was a decision within their legislative discretion. The district court thus also properly rejected Steiner's argument for the reasons it cited from Renton. "It is not our function to appraise the wisdom of the city's decision . . . . The city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." Renton, 475 U.S. at 52 (quoting American Mini Theatres, 427 U.S. at 71).

Because the County is in a better position to determine solutions to possible negative secondary effects, and because a certain amount of deference is owed to those solutions, it is not for this Court to second-guess the County's rationale. The district court thus did not err in rejecting Steiner's argument.

Finally, Steiner contends that the Enactments are unconstitutional because they do not provide for adequate alternative avenues of expression. He asserts that "[t]he evidence showed that the sites proffered by the County were unavailable because they lacked infrastructure and would require Steiner to develop and subdivide quantities of land far larger than a generic commercial user would reasonably be expected to bear in the real estate market." Br. of Appellant 55. Steiner's expert testified that a developer would have to "expend an unreasonable amount of money" in order to open an AOB on the available sites in the County. J.A. 2084.

The district court held that "to demonstrate a genuine issue of material fact Steiner must present evidence demonstrating that the land is actually unavailable, not that the land available is simply economically undesirable." J.A. 53. Ultimately, the district court held that "[d]isregarding his elimination of sites under the Moratorium and the Ordinance for economic reasons, Steiner's expert has identified reasonable alternatives given that Steiner is the only AOB operator seeking to enter Caroline County." J.A. 55. Therefore, "no reasonable fact finder could find that the Zoning Enactments fail to allow reasonable alternative avenues of communication." J.A. 55. We agree.

The First Amendment requires that an ordinance "allow[] for reasonable alternative avenues of communication." Renton, 475 U.S. at 50. However, the Renton Court emphasized that "the First Amendment requires only that [the municipality] refrain from effectively denying respondents a reasonable opportunity to open and operate an [AOB]." Id. at 54. "That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers . . . does not give rise to a First Amendment violation." Id. A plaintiff must show something greater than mere inconvenience or economic undesirability. "[W]e have never suggested that the First Amendment compels the Government to ensure that adult theaters . . . will be able to obtain sites at bargain prices." Id.

While the Court in Renton did not prescribe a specific number or percentage of available sites, it did hold in that case that five percent of the land of Renton was available to AOBs, and that this amount was "ample" and constituted a "reasonable opportunity to open and operate" an AOB. Id. at 53-54. Although in this case the record does not reflect the exact percentage of available land open to AOBs, the County demonstrated multiple sites which met the requirements of the Moratorium and the Ordinance.

Steiner's expert argues that twelve of these sites are not feasible because they are "undeveloped and essentially raw land"

or have existing uses. J.A. 2084. However, these arguments mirror the unsuccessful arguments of the plaintiffs in Renton, who contended that the land was already occupied by existing businesses, that "practically none" of the land was currently for sale or lease, and that the sites were not "commercially viable." Renton, 475 U.S. at 53. The record supports the district court's finding that there were a number of AOB sites available to Steiner. The fact that Steiner may not have desired to pay fair market value or develop the sites is not proof of a lack of available alternate sites. Steiner's preference for siting an AOB at The 19th Hole bears no nexus to whether there are adequate alternative avenues of expression.

Therefore, the district court did not err in determining that the Enactments did not eliminate alternate avenues for expression by AOBs.

III.

For the foregoing reasons, the district court's judgment is

AFFIRMED.